UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

| | |
|---|---|
| STEPHEN DESMUND PETERSON, a/k/a STEVEN DESMOND PATTERSON, | CIVIL ACTION NO. 6:14-CV-134-KKC |
| **Plaintiff,** | |
| v. | **MEMORANDUM OPINION** |
| | **AND ORDER** |
| UNITED STATES OF AMERICA, et al., | |
| **Defendants.** | |

*** *** ***

Plaintiff Stephen Desmund Peterson is a federal inmate presently confined at the United States Penitentiary-McCreary ("USP-McCreary") in Pine Knot, Kentucky. Proceeding *pro se*, Peterson filed a complaint, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), against the United States of America, the United States Department of Justice, the Director of the Federal Bureau of Prisons ("BOP"), Norbert Rosario, M.D., a physician in the Medical Department at United States Penitentiary in Inez, Kentucky ("USP-Big Sandy"), and numerous prison personnel at the USP-McCreary. Peterson claims that he is entitled to compensatory damages under the FTCA due to the negligence and/or medical malpractice associated with surgery to his right forearm on October 27, 2009. Post-surgery, he further claims that various prison officials and employees have been deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment to the U.S. Constitution. Peterson seeks declaratory and injunctive relief and compensatory damages. [R. 1].

Peterson also asserted claims against various prison officials at (1) United States Penitentiary-Victorville ("USP-Victorville") in Adelanto, California, (2) the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC-Oklahoma"), and (3) the Federal Medical Center in Springfield, Missouri ("FMCP-Springfield"), as well as state law claims for negligence and/or medical malpractice against Dr. Louis Redix, an orthopedic surgeon in California who performed the surgery on his right forearm on October 27, 2009, various other hospital staff at Barstow Community Hospital, a hospital located in Barstow, California, and Dr. Patrice Beliveau, an orthopedic surgeon in Kentucky.  However, by Memorandum Opinion and Order of January 22, 2015, Peterson's claims against prison officials and employees in BOP institutions outside of Kentucky were severed from this action and transferred to other judicial districts, and his state law claims for negligence against medical personnel in California and Kentucky were dismissed without prejudice to his right to refile in the appropriate state courts in California and Kentucky, respectively. [R. 8].

This matter is before the Court for completion of the statutory screening required by 28 U.S.C. §§ 1915(e)(2), 1915A.  Having completed this screening, for the reasons stated below, Peterson's FTCA claim and his *Bivens* claims against all remaining defendants will be dismissed.

## FACTUAL BACKGROUND

On or about October 27, 2009, during the time he was confined at USP-Victorville, Peterson underwent surgery at Barstow Community Hospital in Barstow, California, for repair of the malunion/nonunion of an ulna fracture of the right forearm.  This malunion/nonunion condition apparently resulted from the imperfect healing of a bone broken from a gunshot Peterson sustained in 1993. [R. 1-3, Page ID# 215] Dr. Louis Redix,

an orthopedic surgeon, performed the surgery and described this procedure as "Repair of malunion of the ulna bone with bone graft."[1] [R. 1-2, Page ID# 46] Peterson states that he received an "allograft" cadaver bone implant and that the source of that bone was from the hospital's bone bank.  Peterson claims that he had not consented to the receipt of a cadaver implant.  [R. 1, Page ID# 10] Following surgery, his arm was placed in a cast.  Peterson remained hospitalized for a couple of days and was returned to USP-Victorville on October 29, 2009.  [R. 1-2, Page ID #60]

Apparently, Peterson was released from the hospital with no surgical after-care instructions.  Ann Pierce, PA-C, in Health Services at USP-Victorville instructed him to keep the cast dry and his arm elevated.  *Id.*  Acetaminophen with codeine and ibuprofen were prescribed for pain relief.  *Id.*  On November 2, 2009, one week post-surgery, Peterson returned to Health Services complaining of pain and swelling not relieved by Motrin.  *Id.* at 63.  Acetaminophen with codeine was prescribed, and he was instructed to follow up as needed.  *Id.* at 64.  Peterson was seen at Health Services again on November 19, 2009, in his third week post-surgery, for a follow-up.  He had removed his cast against advice.  The examination showed mild swelling and tenderness, and a surgical wound with minimal sero-sanguinous discharge.  *Id.* at 67.   Cephalexin was prescribed and the ibuprofen prescription was renewed.  Peterson was instructed to follow-up at Sick Call as needed.  *Id.* at 68.  Peterson returned to Health Services on December 20, 2009, complaining of pain in his right forearm after doing pushups.  *Id.* at 71.  An ace wrap bandage was applied to area and an x-ray was ordered.  *Id.*

---

[1] Dr. Redix also repaired the malunion of proximal phalanx of Peterson's right index finger during this surgery.  *Id.*  However, that surgical repair is not at issue in this case.

The following day, December 21, 2009, Peterson was transferred to USP-McCreary. During the transfer process, he was housed for a period of time at FTC-Oklahoma. *Id.* at 126. While there, his right forearm was x-rayed. The findings were: "Abnormal. Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw. Ballistic fragments, non-union of fracture fragments." *Id.* at 75. Peterson arrived at USP-McCreary on January 7, 2010. *Id.* at 77. On January 11, 2010, he was at Health Services and requested an appointment with his Primary Care Provider to discuss the x-rays of his right forearm and finger. *Id.* at 82. He was continued on current medications and restrictions until seen by the Primary Care Provider. *Id.*

On March 26, 2010, Peterson went to Sick Call complaining of nausea/vomiting that had started the previous day. He also reported having a headache. *Id.* at 90. A Loperamide capsule was prescribed, and a follow-up x-ray was scheduled for April 9, 2010. *Id.* at 91. He was instructed to follow-up at Sick Call and Chronic Care as needed. *Id.*

On April 5, 2010, Peterson was examined at Health Services again. An x-ray report of his forearm, previously lost or misfiled, had been found and showed abnormal findings regarding his right forearm. An orthopedic consultation for evaluation and possible surgical intervention was noted in Peterson's medical record. *Id.* at 95. On April 26, 2010, Peterson was advised that a request for an orthopedic consultation had been approved and was awaiting scheduling. *Id.* at 97. The results of Peterson's repeated x-ray were: "Abnormal. - fractured fixation plate. - nonunited mid ulner fracture with distraction and angulation." *Id.* at 100.

Peterson's orthopedic consultation occurred on June 18, 2010, when he was examined by Ronald S. Dubin, M.D., at Kentucky Orthopedic Clinic. This examination included x-rays being taken on that date. Dr. Peterson's impression was: "Non union

proximal ulna with broken plate." *Id.* at 113.  His recommendation was that "the plate should be removed and the proximal ulna should be bone grafted." *Id.*  Also, due to the prior surgery, he recommended that a traumatologist perform this procedure. *Id.*  His surgery was scheduled for November 30, 2010, but had to be rescheduled because Peterson was transferred to another institution on November 22, 2010. *Id.* at 129.  He was returned to USP-McCreary on December 28, 2010. *Id.*

On April 11, 2011, Dr. Patrice Beliveau, an orthopedic surgeon at Premier Orthopedics and Sports Medicine in London, Kentucky, performed a consultative examination of Peterson in preparation for a second surgery on his right forearm.  Her impression was "right ulna non-union with broken hardware." *Id.* at 133.  On November 1, 2011, Peterson was admitted to St. Joseph Hospital in London, Kentucky, for the second surgery to his right forearm.  Dr. Patrice Beliveau performed this surgery. *Id.* at 140-141.  Peterson remained hospitalized until December 6, 2011. *Id.*  He was released with a follow-up treatment plan prescribed by Dr. Beliveau. *Id.*

On December 6, 2011, Peterson was transferred to FMCP-Springfield for an orthopedic surgery consultation that was performed by Gregory P. Daus, M.D., a consulting orthopedic surgeon, on December 12, 2011.  *Id.* at 152-53.  Dr. Daus's Assessment and Plan are set out below:

ASSESSMENT:     Status post open reduction and internal fixation with bone grafting, right ulna fracture, complicated by methicillin-resistant Staphylococcus aurea (MRSA) and Enterococcus-positive cultures at surgery; currently on dapatomycin.

PLAN:     Patient is to finish out a total course of eight weeks of IV antibiotics.  He is to follow-up with his orthopedic surgeon in Kentucky.  Currently, I see no evidence of obvious infectious process; bond graft incorporation, however, has not occurred yet.  He is going to follow-up

> with me on an as-needed basis.  He is going to be placed
> in an ulnar gutter splint.

*Id.* at 152-53.

Subsequently, on May 24, 2012, Peterson was returned to USP-McCreary.  On September 12, 2012, Peterson went to Sick Call, complaining of pain in his right forearm. *Id.* at 166.  Naproxen was prescribed. *Id.* at 167.  At that time, Peterson was also counseled about his forearm.  His medical record contains the following note: "Hardware in forearm is in correct position, but bone did not grow back together.  Do not play sports, do push-ups, pull-ups or apply significant weight/stress on right forearm.  Aware that no further orthopedic surgical interventions would be beneficial at this time, per MD." *Id.*

With the exception of Peterson's claim concerning the termination of his employment with UNICOR at USP-McCreary, and his claim regarding the loss or theft of some of his property at USP-McCreary, during the time he was away from USP-McCreary for a second surgery to his right forearm in November of 2011 and the subsequent post-surgery hospitalization/follow-up consultation and care for a period of time, Peterson's complaint concerns the surgical procedure performed on October 27, 2009, and the associated events that have unfolded/developed following that surgery.

## DISCUSSION

### A.    Federal Tort Claims Act ("FTCA")

The United States of America is immune from suit except where its sovereign immunity is explicitly waived. *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA waives the sovereign immunity of the United States government and allows federal district courts to hear tort actions against the federal government for ". . . injury or loss of property, or personal injury or death caused by the negligent or wrongful act or

omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). *Levin v. United States*, 133 S. Ct. 1224, 1228 (2013).

The FTCA is the exclusive remedy for tort actions against the federal government, its agencies and employees. *Ascot Dinner Theatre v. Small Business Admin.*, 887 F.2d 1024, 1028 (10th Cir. 1989). Federal prisoners are included as possible plaintiffs in FTCA cases. *United States v. Muniz*, 374 U.S. 150 (1963). *See also*, 28 U.S.C. § 1346(b)(1); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004). A claim under the FTCA may only be asserted against the United States of America. *See* 28 U.S.C. § 2674; *Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009) ("The United States is the only proper defendant in an FTCA action."); *Jackson v. Kotter*, 541 F.3d 688, 693 (7th Cir. 2008) ("The only proper defendant in an FTCA action is the United States."). The United States of America is properly named as a defendant herein.

A plaintiff must exhaust his FTCA claim before the Court has jurisdiction over his lawsuit. 28 U.S.C. § 2675(a); *Holt v. Morgan*, 79 F. App'x 139, 141 (6th Cir. 2003) ("Failure to exhaust administrative remedies deprives a federal court of jurisdiction over the [FTCA] claim." (citation omitted)). Thus, an inmate must first present his claim (typically, by filing a Standard Form 95) to the regional office of the Bureau of Prisons (BOP), and the agency must deny his request, 28 U.S.C. § 2675(a), before the inmate is authorized to file an FTCA claim in the district court. If the plaintiff does not file an administrative claim and receive a denial from the agency before filing suit, the Court must dismiss the claim for want of jurisdiction. *McNeil v. United States*, 508 U.S. 106, 113 (1993).

The exhibits attached to Peterson's complaint reflect that on or about October 8, 2013[1], Peterson submitted a tort claim on a Standard Form 95 against the United States. [R. 1-3, pp. 45-64]. This claim concerned (1) the alleged negligence/medical malpractice associated with Peterson's surgery on October 27, 2009, in Barstow, California, and the complications arising therefrom, and (2) the theft and/or loss of Peterson's personal property that occurred at USP-McCreary while Peterson was away from the prison. Peterson sought damages of $87.00 for the loss or theft of his property, and he requested $1,000,000.00 in damages for the negligence, deliberate indifference, and pain and suffering he endured regarding the October 2009 surgery and associated post-surgical developments. *Id.*

The BOP identified Peterson's tort claim as Administrative Tort Claim No. 2014-00048. [R. 1-3, p. 65]. On October 16, 2013, the BOP denied this tort claim because it was time-barred, explaining as follows:

> . . . In your claim you indicate that your injury occurred when surgery was conducted at the Barstow California Community Hospital, on October 27, 2009. Specifically, a cadaver bone was placed in your right forearm, without your consent, to correct a deformity. Under Section 2401(b) a tort claim accrues at the time of the Plaintiff's injury. Accordingly your claim accrued on October 27, 2009. You filed your tort claim on October 15, 2013 thereby your claim has been filed beyond the two-year statute of limitations.

[R. 1-3, p. 65].

---

[1]Peterson's FTCA claim is signed and dated October 8, 2012; however, the BOP receipt stamp on this claim is dated October 15, *2013*. *Id.* Based on a review of the attachments to Peterson's tort claim, the Court concludes that the date of October 8, 2012, contains a typographical error, in that the date "2012" should actually be "2013." The conclusion is based on Page 13 of the attachments to Peterson's tort claim, wherein he states: "As of 10-09-2013, Peterson's right forearm has not heal[ed] . . ." [R. 1-3, Page ID# 204].

At Peterson's request, the BOP reconsidered its denial of his tort claim. On December 18, 2013, the BOP again denied Peterson's tort claim, but this denial was on the merits. The BOP explained its denial, as follows:

> A thorough review of your medical records reveals your medical issues stem from an injury which occurred prior to your incarceration. Your history of non-compliance with medical instructions has complicated and impeded the effectiveness of treatment rendered to you. Since your most recent surgery in November 2011, you have been clinically followed and managed appropriately in an effort to enable you to function at your maximum potential given the extent of your original injury.
>
> There is no evidence of BOP staff negligence and based upon this information, your claim is denied. This letter constitutes a formal denial of your claim. If you are not satisfied with our determination in this matter, you may file suit in the appropriate U.S. District Court no later than six months from the date of this letter.

[R. 1-3, p. Page ID# 216].

Regardless of the BOP's reconsideration of Peterson's tort claim on the merits, the Court concludes that the BOP's initial denial of Peterson's tort claim as being time-barred was a correct decision. The BOP noted that to be timely, an FTCA claim must be filed within two years of the date the claim accrued. Thus, Peterson had a two-year window within which to submit a tort claim to the BOP. While Peterson may not have known on October 27, 2009, the date of the initial surgical repair and allograft implant, that he had been injured at that time, it is clear that he had reason to know or should have known several weeks thereafter that there were problems associated with his surgery, given the pain he was experiencing and the fact that the healing process appeared to be impaired. For these reasons, Peterson's FTCA claim, filed in October of 2013, **nearly four years after his initial surgery on October 27, 2009**, was not timely presented to the BOP and is time-barred. Consequently, a federal district court is without jurisdiction to consider it. Peterson's FTCA claim will be dismissed.

**B.**   ***Bivens* claims**

To state a constitutional claim that is cognizable as a *Bivens* action under 28 U.S.C. § 1331, a plaintiff must plead and prove two essential elements.  He must show, first, the deprivation of right(s) secured by the Constitution or laws of the United States and, second, that the defendants allegedly depriving him of those rights acted under color of federal law. *Id*. at 397.   Peterson properly alleged these two elements with regard to all named defendants.

One issue raised in Peterson's factual allegations relates to the administrative remedies which he has pursued and exhausted within the BOP.  Pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), a prisoner seeking compensation from government employees through the courts must first exhaust whatever administrative remedies are available to him or her.  The attachments to Peterson's complaint reflect that he has filed at least two administrative remedies concerning the medical care he has received at USP-McCreary relative to his right forearm.[2] See Administrative Remedy Nos. 629060-F1 and 697537-F1, 697537-R1, and 697537-A1 to A4.  [R. 1-3, Page ID## 171-176; 179-189].  Administrative Remedy No. 697537-F1, 697537-R1, and 697537-A1 appears to be exhausted, but it is unclear whether Administrative Remedy No. 629060-F1 was exhausted. [R. 1-2, Page ID# 129]

Since Peterson had exhausted at least one administrative remedy concerning the medical care he received at USP-McCreary for his right forearm issue, the Court previously concluded that his *Bivens* claims should go forward for the required statutory screening as to the named USP-McCreary and USP-Big Sandy defendants.  However, for the reasons stated in the <u>Memorandum Opinion and Order</u> of January 22, 2015, Peterson's claims against the federal employees at BOP facilities located outside of Kentucky who were

named as *Bivens* defendants herein could not go forward, as a matter of law, and Peterson's claims against them were severed and transferred to other judicial districts.   [R. 8]. Additionally, Peterson's state law negligence claims were dismissed without prejudice to Peterson's right to refile in the state courts in California and Kentucky, respectively.  *Id.*

### Eighth Amendment Standards

The Supreme Court has held that "[i]n order to state a cognizable claim [under the Eighth Amendment with regard to medical care] a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Therefore, a prisoner must show both "deliberate indifference" and "serious medical needs."  *Id*.  "Deliberate indifference" means that prison medical staff knew of the inmate's serious medical needs, but intentionally disregarded an excessive risk of harm to the inmate, or that prison guards or medical staff intentionally prevented the inmate from receiving prescribed treatment or intentionally delayed or denied him access to medical care.  *Estelle*, 429 U.S. at 104-105; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Eighth Amendment contains both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294 (1991).  The objective component requires the existence of a "sufficiently serious medical need."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 897.  The subjective component requires a plaintiff to show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety, which is to say the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006) *quoting Farmer*, 511 U.S. at 837. Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison [staff] in *intentionally* denying or delaying access to medical care or *intentionally* interfering with treatment once prescribed." *Estelle*, 429 U.S. at 104. (Emphasis added).

However, no claim of a constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning an appropriate course of treatment. *Sharpe v. Patton, et al.*, No. 08-CV-58-HRW, 2010 WL 227702 (E.D. Ky. 2010). When the cause of action is based on an allegation that the prescribed treatment was inadequate in some way, rather than on an allegation that the prison official failed to provide the plaintiff with any treatment, courts traditionally have been reluctant to second-guess the medical official. *Rodriguez v. Lappin*, 08-CV-347-GFVT, 2009 WL 2969510 (E.D. Ky. 2009). Simply put, differences of opinion as to matters of medical judgment, negligent treatment or even medical malpractice are insufficient to establish that one has received inadequate medical care in violation of the Eighth Amendment. *See, e.g., Greer v. Daley*, No. 01-C-586-C, 2001 WL 34377922, 3 (W.D. Wis. 2001). In *Greer*, some of the inmate's physicians requested surgery to correct a deviated septum, but that request was denied by other physicians, including the Medical Director, based on their medical opinion that surgery was unnecessary. The court in *Greer* held that the dispute among medical professionals concerning the inmate's need for the surgery in question does not rise to the level of an Eighth Amendment claim for inadequate medical care.

Additionally, in *Alexander v. Federal Bureau of Prisons*, 227 F. Supp.2d 657 (E.D. Ky. 2002), this Court addressed a prisoner's challenge to his medical treatment and granted summary judgment to the Bureau of Prisons under the following rationale:

> . . . While it appears that the plaintiff has not gotten what he wants, what he wants is not the issue. Ordering a specific type of surgery is not the appropriate function of this Court. The Court agrees with the defendants that, at most the plaintiff has alleged a difference in opinion between the plaintiff and his health care providers regarding the expediency of a specific treatment. This does not generally create a constitutional claim.

*Id*. at 666.

Before addressing Peterson's claims against the health care providers/medical personnel in the Medical Department at USP-McCreary who actually saw, examined, and/or treated Peterson, the Court first turns to Peterson's claims against the supervisory, managerial, executive personnel and other prison employees not associated with the Medical Department.

**1.      Claims against the Director of the BOP**

While not identifying him by name, Peterson names the Director of the BOP as a defendant.[2]  Peterson does not identify the conduct of the BOP's Director or the actions he took that violated his Eighth Amendment rights.  Peterson simply identifies the Director of the BOP as a defendant on page 2 of his complaint, noting that:  "He is legally responsible for the overall operations of the Department and each institution under its jurisdiction, including . . . U.S.P. McCreary, . . .  [R. 1, p. 2].  Peterson makes no claim that the BOP Director was directly involved in or had any personal knowledge of his surgeries, the complications therefrom, and the medical care and treatment he has received at the various

---

[2]The Court takes judicial notice that the current director of the BOP is Charles Samuels, Jr.  His office is located in the BOP's Central Office in Washington, D.C.

BOP institutions where he has been confined post-surgery.  Peterson has named the BOP Director as a defendant simply because he is the Director, not because he took any action that violated Peterson's constitutional rights.

To the extent that Peterson has named BOP Director Charles Samuels, Jr., as a defendant based on his supervisory capacity, his claims against the BOP Director must be dismissed.  It is well-settled that *respondeat superior* cannot form the basis of liability in a *Bivens* action.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003).  Supervisor liability must be premised on either direct or personal involvement of the named defendant.  *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson County, Ky.*, 668 F.2d 869 (6th Cir. 1982).  *See also, Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) (municipality cannot be held liable under § 1983 on *respondeat superior* theory).  The Sixth Circuit has confirmed that to establish any supervisory liability, a plaintiff must allege more than a mere right to control employees and more than negligence.  A plaintiff must allege that the supervisor condoned, encouraged or participated in the alleged misconduct.  *Hays*, *supra*. *See also, Carrie v. Rios*, 2008 WL 320329, 2 (E.D. Ky. 2008) (supervisor must "have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.")

As recounted above, Peterson has failed to articulate how the BOP Director, during the relevant period, had any knowledge of, encouraged or directly participated in any alleged misconduct.  It appears that Peterson named the BOP Director as a defendant herein based solely upon his executive or supervisory position within the BOP.  Clearly, Peterson has not asserted any direct or personal involvement by the BOP Director.  As such, supervisory liability does not attach.  *Combs v. Wilkinson*, 315 F.3d 548, 560 (6th Cir. 2002).  Consequently, Peterson's *Bivens* claim against the BOP Director must be dismissed.

**2.      Claims against the present and former Wardens at USP-McCreary**

On page 3 of his complaint, Peterson names J. C. Holland, present Warden at USP-McCreary, and Eric Wilson and B. Ives, former Wardens at USP-McCreary, as defendants, noting: "They are legally responsible for the operation of . . . McCreary . . . and the welfare of all the inmates in [that prison]."   [R. 1, at p. 3].   Peterson makes no claim that J. C. Holland, the present Warden at USP-McCreary, or the former Wardens, Eric Wilson and B. Ives, were directly involved in or had any personal knowledge of his surgeries, the complications therefrom, and the medical care and treatment he has received at USP-McCreary.   Peterson has named the present and two former Wardens at USP-McCreary as defendants simply because of their supervisory/managerial/executive positions at the prison, not because they took any personal action themselves that violated Peterson's constitutional rights.

To the extent that Peterson has named the present Warden and two former Wardens as   defendants based on their supervisory positions at USP-McCreary, his claims against them must be dismissed.   To reiterate, it is well-settled that *respondeat superior* cannot form the basis of liability in a *Bivens* action. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003).   Supervisor liability must be premised on either direct or personal involvement of the named defendant. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson County, Ky.*, 668 F.2d 869 (6th Cir. 1982).   *See also, Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) (municipality cannot be held liable under § 1983 on *respondeat superior* theory).   The Sixth Circuit has confirmed that to establish any supervisory liability, a plaintiff must allege more than a mere right to control employees and more than negligence.   A plaintiff must allege that the supervisor condoned, encouraged or

participated in the alleged misconduct.  *Hays*, *supra*.  *See also, Carrie v. Rios*, 2008 WL 320329, 2 (E.D. Ky. 2008) (supervisor must "have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.")

As recounted above, Peterson has failed to articulate how J. C. Holland, Eric Wilson, and B. Ives, present and former Wardens at USP-McCreary, during the relevant period, encouraged or directly participated in any alleged misconduct.  It appears that Peterson named them as defendants herein based solely upon their executive, supervisory, or managerial positions at USP-McCreary.  Clearly, Peterson has not asserted any direct or personal involvement by J.C. Holland, Eric Wilson, and B. Ives.  As such, supervisory liability does not attach.  *Combs v. Wilkinson*, 315 F.3d 548, 560 (6th Cir. 2002).  Consequently, Peterson's *Bivens* claims against J. C. Holland, Warden at USP-McCreary, and Eric Wilson and B. Ives, former Wardens at USP-McCreary must be dismissed.

**3.     Claims against the Assistant/Acting Warden and Acting Warden at USP-McCreary**

On page 7 of his complaint, Peterson names J. Ray Ormond, noting that he "held the rank of Assistant Warden/Acting Warden," [R. 1, at p. 7], and H. Quay, noting that he "held the rank of Acting Warden," *id.,* at USP-McCreary, during all relevant times mentioned in the complaint.  However, similar to his claims against the current Warden and two former Wardens, Peterson makes no claim that these two Acting Wardens and/or Associate Wardens, J. Ray Ormond or H. Quay, were directly involved in or had any personal knowledge of his surgeries, the complications therefrom, and the medical care and treatment he has received at USP-McCreary.  In fact, after naming them as defendants on page 7 of his complaint, Peterson fails to specify what actions they took or did not take and/or what their conduct was that he believes constitutes a violation of his constitutional

rights.   Clearly, Peterson has named these two Acting Wardens and/or Acting/Associate Wardens as defendants simply because of their supervisory/managerial/executive position at the prison, not because they took any personal action themselves that violated Peterson's constitutional rights.

Because Peterson has failed to articulate how J. Ray Ormond, Assistant Warden/Acting Warden, and H. Quay, Assistant Warden, at USP-McCreary, during the relevant period, encouraged or directly participated in any alleged misconduct, his *Bivens* claims against them must be dismissed.  Again, *respondeat superior* cannot form the basis of liability in a *Bivens* action.

### 4.    Claims against Norbert Rosario, M.D.

On page 7 of his complaint, Peterson names Norbert Rosario as a defendant, noting that he "held the rank of Medical Officer [and] was assigned to USP-Big Sandy's Medical Staff."  [R. 1, at p. 7].  Peterson's naming of Norbert Rosario, as a defendant herein is perplexing because Peterson is confined at USP-McCreary, and Norbert Rosario, M.D., is a Medical Officer at USP-Big Sandy in Inez, Kentucky; he is not on the medical staff at USP-McCreary.  Peterson does not state that Norbert Rosario, M.D., was ever a medical officer at USP-McCreary during any time relevant to the complaint, and he does not state that he was ever housed at USP-Big Sandy at any time where he encountered or was treated or examined by Norbert Rosario, M.D.

The exhibits attached to Peterson's complaint comprise a total of 173 pages.  [R. 1-2 contains 102 pages, and R. 1-3 contains 71 pages].  A review of these 173 pages reflects that on May 2, 2011, Norbert Rosario, M.D., signed and stamped the consultative examination report of Dr. Patrice Beliveau, an Orthopedic Surgeon located in London, Kentucky, who examined Peterson on April 11, 2011.  [R. 1-2, at pp. 88-89].  Initially, Dr. Beliveau's report

may have been sent inadvertently to USP-Big Sandy, instead of USP-McCreary, and then later forwarded to USP-McCreary. This possible scenario provides a logical explanation as to why Norbert Rosario, M.D., Medical Officer at USP-Big Sandy, would have had reason to receive Dr. Beliveau's report of her consultative examination of Peterson. However, the Court is merely speculating as to this possible scenario. Nevertheless, this series of possible events does not give rise to any viable *Bivens* claim against Norbert Rosario, M.D., as Peterson makes no claim whatsoever that he was ever seen, examined, or treated by Norbert Rosario, M.D., Medical Officer at USP-Big Sandy. Consequently, Peterson's claim against Norbert Rosario, M.D., will be dismissed for failure to state a *Bivens* claim against him.

**5.     Claim against B. Barron, Hospital Administrator**

On page 5 of his complaint, Peterson names B. Barron as a defendant, noting that she "held the rank of Hospital Administrator and was assigned to USP-McCreary Medical Department." [R. 1, at p. 5]. Additionally, on page 35 of his complaint, Peterson states: "On or about 5/2012 – 5/2014 Mrs. M. Barron[3] was aware of plaintiff [sic] medical condition and oversaw all contractors and medical staff at U.S.P. McCreary." [R. 1, at p. 35].

Peterson makes no claim that Mrs. B. Barron, in her capacity as Hospital Administrator at USC-McCreary, ever personally saw, examined, or treated him for any reason at any time while he has been confined there. Thus, it appears that Peterson has named Hospital Administrator B. Barron as a defendant based solely on her supervisory position at USP-McCreary. For this reason, his claims against her must be dismissed. To reiterate, it is well-settled that *respondeat superior* cannot form the basis of liability in a

---

[3]The Court presumes that in this instance, Peterson erroneously inadvertently referred to B. Barron as "M. Barron," and that he actually meant to stated B. Barron, as there is no other person with the surname of Barron contained in the complaint.

*Bivens* action. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003). Supervisor liability must be premised on either direct or personal involvement of the named defendant. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson County, Ky.*, 668 F.2d 869 (6th Cir. 1982). *See also, Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) (municipality cannot be held liable under § 1983 on *respondeat superior* theory). The Sixth Circuit has confirmed that to establish any supervisory liability, a plaintiff must allege more than a mere right to control employees and more than negligence. A plaintiff must allege that the supervisor condoned, encouraged or participated in the alleged misconduct. *Hays*, *supra*. *See also, Carrie v. Rios*, 2008 WL 320329, 2 (E.D. Ky. 2008) (supervisor must "have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.")

As recounted above, Peterson has failed to articulate how B. Barron, during the relevant period, encouraged or directly participated in any alleged misconduct. It appears that Peterson named her as a defendant herein based solely upon her executive, supervisory, or managerial position at USP-McCreary. Clearly, Peterson has not asserted any direct or personal involvement by B. Barron. As such, supervisory liability does not attach. *Combs v. Wilkinson*, 315 F.3d 548, 560 (6th Cir. 2002). Consequently, Peterson's *Bivens* claim against B. Barron, Hospital Administrator, must be dismissed.

**6.    Claim against Rhonda Jones, Hospital Administrator**

On page 5 of his complaint, Peterson names Rhonda Jones as a defendant, noting that she "held the rank of Hospital Administrator and was assigned to USP-McCreary Medical Department." [R. 1, at p. 5]. Additionally, on page 28 of his complaint, Peterson states:  "On or about 6-18-2010 HSA Rhonda Jones was supervisor over all of U.S.P. McCreary Medical Staff." [R. 1, at p. 28].

Peterson makes no claim that Rhonda Jones, in her capacity as Hospital Administrator at USC-McCreary, ever personally saw, examined, or treated him for any reason at any time while he has been confined there. It appears that Peterson has named Hospital Administrator Rhonda Jones as a defendant based solely on her supervisory position at USP-McCreary. For this reason, his claims against her must be dismissed. For all of the reasons stated above, *respondeat superior* cannot form the basis of liability in a *Bivens* action.

As recounted above, Peterson has failed to articulate how Rhonda Jones, during the relevant period, encouraged or directly participated in any alleged misconduct. It appears that Peterson named her as a defendant herein based solely upon her executive, supervisory, or managerial position at USP-McCreary. Clearly, Peterson has not asserted any direct or personal involvement by Rhonda Jones. As such, supervisory liability does not attach. *Combs v. Wilkinson*, 315 F.3d 548, 560 (6th Cir. 2002). Consequently, Peterson's *Bivens* claim against Rhonda Jones, Hospital Administrator, must be dismissed.

**7. Claim against Larry Stephens, Assistant Hospital Administrator**

On page 5 of his complaint, Peterson names Larry Stephens as a defendant, noting that he "held the rank of Assistant Hospital Administrator and was assigned to USP-McCreary Medical Department." [R. 1, at p. 5]. Additionally, on pages 32-33 of his complaint, Peterson states:

> On or about 11-07-2011, L. Stephens, AHSA, was deliberate [sic] and indifference [sic] to plaintiff's medical need when he along with Dr. Patrice Beliveau and Dr. Arif Khan conspired together to cover-up the fact that Dr. Luis Redux placed another person's bone "Allograft" in the plaintiff's forearm that was contaminated with interoccuss faecilis. No where in L. Stephens's Administrative Notes did he mentioned [sic] that plaintiff had enterococcuss faecalis in his right forearm (Exhibit #1).

[R. 1, at pp. 32-33].

Some background information is necessary to explain Peterson's reference to Larry Stephens' Administrative Notes referred to above:  On November 1, 2011, Peterson was admitted to St. Joseph Hospital in London, Kentucky, for the purpose of undergoing a second surgery to his right forearm as a consequence of the problems he had encountered following the initial surgery to this same forearm in October of 2009, at Barstow Community Hospital in Barstow, California.  Dr. Patrice Beliveau, an Orthopedic Surgeon in London, Kentucky, performed this second surgery in November of 2011.   Peterson remained hospitalized at St. Joseph in London, Kentucky, until December 6, 2011.  [R. 1-2, pp. 96-97].

While Peterson was hospitalized at St. Joseph in London, Kentucky, ASHA Larry Stephens entered some Administrative Notes in Peterson's medical records at USP-McCreary, following his conversations with either Dr. Beliveau, her staff, or hospital personnel at St. Joseph Hospital in London.  The first Administrative Note, entered on November 7, 2011, states:  "Talked with nurse this am, states inmate has MRSA in incision or bone.  Will be placing a PICC line today for IV antibiotics times six weeks.  Is currently getting Cubicin."  [R. 1-3, p. 2].  The next Administrative Note, dated November 8, 2011, states: "Inmate had Picc [sic] Line placed yesterday, will receive first dose of Cubicin today at 1600.  Has been placed on Lovenox.  Condition is stable, awaiting approval to transfer." [R. 1-3, p. 3].  The remaining two Administrative Notes, dated November 10 and November 14, 2011 provide a status report of Peterson's condition and are unremarkable.  [R. 1-3, pp. 4-5].

These Administrative Notes refute Peterson's claim that there was a conspiracy among Larry Stephens, Dr. Patrice Beliveau, and Dr. Arif Khan to conceal the fact that he

had contracted MRSA, apparently from the initial surgery in California in 2009. Further, these Administrative Notes also establish that Peterson has failed to state a *Bivens* claim against Larry Stephens, AHSA at USP-McCreary. Peterson makes no claim that Larry Stephens ever personally saw, examined, or treated him for any reason at any time while he has been confined there. The Sixth Circuit has confirmed that to establish any supervisory liability, a plaintiff must allege more than a mere right to control employees and more than negligence. A plaintiff must allege that the supervisor condoned, encouraged or participated in the alleged misconduct. *Hays*, *supra. See also, Carrie v. Rios*, 2008 WL 320329, 2 (E.D. Ky. 2008) (supervisor must "have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.")

As recounted above, Peterson has failed to articulate how Larry Stephens, during the relevant period, encouraged or directly participated in any alleged misconduct. The Administrative Notes made by Larry Stephens to which Peterson refers simply document what happened to Peterson and/or his medical condition while Peterson was hospitalized at St. Joseph Hospital for the surgery to his right forearm. These Administrative Notes describe information conveyed to Larry Stephens from medical personnel outside of USP-McCreary so as to document what happened to Peterson and to provide a status report of Peterson's progress following surgery. In no way can these Administrative Notes form the basis of a *Bivens* claim against Larry Stephens. Clearly, Peterson has not asserted any direct or personal involvement with him by Larry Stephens. As such, supervisory liability does not attach. *Combs v. Wilkinson*, 315 F.3d 548, 560 (6th Cir. 2002). Consequently, Peterson's *Bivens* claim against Larry Jones, Assistant Hospital Administrator, must be dismissed.

8.     **Claim against Electra Kaloudis, Reading Radiologist**

On pages 6-7 of his complaint, Peterson names Electra Kaloudis as a defendant, noting that she "held the rank of Reading Radiologist and was assigned to USP-McCreary's Medical Department."  [R. 1, at pp. 6-7].  Additionally, on page 24 of complaint, Peterson claims that Electra Kaloudis was negligent and deliberately indifferent to his serious needs by failing to inquire into his work status after reviewing x –ray No. 201003310852127003965 and further by failing to inform the Medical Department of his condition.  [R. 1, p. 24].  Peterson alleges that this failure to pass information along to the Medical Department was an act of deliberate indifference to his serious medical needs and caused more damage to his arm because he was still working in UNICOR and complaining of pain in his arm.  Peterson asserts that if Electra Kaloudis had informed Health Services of this X-ray, he could have been removed from UNICOR to prevent more pain, suffering, and damage to his forearm.  Peterson refers to Exhibit N to the complaint.  [R. 1-2, p. 37]

The X-ray in question [Exhibit N to the complaint] was taken on March 31, 2010.  The X-ray report is on a form with the heading "DIANAssociates, University of Maryland, Radiology Report."  [R. 1-2, p. 56].  The reading radiologist is identified as Electra Kaloudis, M.D.  The findings and conclusions state:  "Abnormal.  – fractured fixation plate. – nonunited mid ulnar fracture with distraction and angulation."  *Id.*  It was logged into USP-McCreary on April 5, 2010.  *Id.*  When prepared, a clerical/typographical/transpositional error occurred in this X-ray report, misidentifying Peterson's BOP inmate number.  It states that his number is 15068-056; his correct inmate number is 15086-095.  The erroneous inmate number on this X-ray report resulted in medical staff at USP-McCreary being unable to readily find or locate this report, as it was initially identified with the

incorrect BOP inmate number.  The report itself does not identify who prepared it.  It simply identifies Electra Kaloudis, M.D., as the reading radiologist.

Regardless of what is contained in this X-ray report and regardless of who prepared it, it provides Peterson absolutely no basis for a *Bivens* claim against Electra Kaloudis, M.D., irrespective of whether she is or is not on the medical staff at USP-McCreary.  As the reading radiologist, her function is simply to read and report what the X-ray shows. Contrary to Peterson's claim, she was under no obligation to alert medical personnel at USP-McCreary of her findings; she was simply obligated to report her findings on the X-ray report.  Nothing more was required or expected of her.  Further, a review of Peterson's medical records reflects that at no time did she examine or treat Peterson.  Consequently, Peterson has failed to state a *Bivens* claim against Electra Kaloudis, M.D., for which relief can be granted.  His claim against her must be dismissed.

**9.   Claim against W. Wood, 4A Counselor**

On page 6 his complaint, Peterson names W. Wood as a defendant, noting that he "held the rank of 4A Counselor and was assigned to USP-McCreary's UnitTeam/Prison." [R. 1, p. 6].   Additionally, on page 23 of complaint, Peterson claims that W. Wood was negligent and deliberately indifferent and beached his duty of care when he failed to contact Health Services at USP-McCreary to inquire about Peterson's medical status before assigning Peterson a job in UNICOR to pay his fines and restitution.  [R. 1, p. 23].  Peterson makes reference to the two X-rays of his right forearm that were taken in 2009 and in 2010. He implies that W. Wood knew or should have known of the findings and conclusions contained in these two X-ray reports.   Peterson claims that W. Woods elected to assign him a job in UNICOR in order to look good in front of his superiors for collecting fine money,

instead of exercising sound judgment by not assigning Peterson a job in UNICOR.  Peterson claims that working in UNICOR caused more damage to his right forearm.  *Id.*

First, W. Wood, a Unit Team Counselor, is not associated with the Medical Department at USP-McCreary.  He is not a medical provider and would have no reason to review or have any knowledge of the two X-ray reports in question.  Second, W. Wood was in no position to assess, examine, or treat Peterson for any medical condition, as he is not qualified to do so.  Thus, W. Wood could not have been deliberately indifferent to Peterson's serious medical needs.  At most, W. Woods arguably might have been negligent in failing to inquire of Peterson's medical status and/or restrictions, if any, prior to assigning him a job in UNICOR.  However, even if W. Wood may have been negligent, this claim appears to be a garden variety state law tort claim for negligence arising under Kentucky law.  As a state law claim brought in a federal-question case, Peterson's negligence claims can only be heard by the Court through the exercise of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.  The exercise of exercise supplemental jurisdiction is discretionary.  District courts may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

In this case, all claims over which the Court has original jurisdiction will be dismissed; thus, the third reason listed under § 1367(c) for declining supplemental jurisdiction over state law claims is applicable.  The Sixth Circuit "has expressed a strong policy in favor of dismissing" state law claims when all federal claims over which the district court had original jurisdiction have been dismissed.  *Staggs v. Ausdenmoore*, No. 92–3172, 1993 WL 131942, *5 (6th Cir. April 27, 1993).  Accordingly, the Court will dismiss without prejudice Peterson's broadly construed state law claim against W. Wood.

**10.    Claim against James Kelly, Duty Officer**

On page 6 his complaint, Peterson names James Kelly as a defendant, noting that he "held the rank of Duty Officer and was assigned to USP-McCreary's Prison."  [R. 1, p. 6].  Department."  [R. 1, at pp. 6-7].  Additionally, on page 24 of his complaint, Peterson claims that James Kelly was negligent and deliberately indifferent to his serious needs by failing to inquire into his work status after reviewing x –ray No. 2010033108521270039965 and further by failing to inform the Medical Department of his condition.  [R. 1, p. 24].  Peterson alleges that this failure to pass information along to the Medical Department was an act of deliberate indifference to his serious medical needs and caused more damage to his arm because he was still working in UNICOR and complaining of pain in his arm.  Peterson asserts that if James Kelly had informed Health Services of this X-ray, he could have been removed from UNICOR to prevent more pain, suffering, and damage to his forearm.  Peterson refers to Exhibit N to the complaint.  [R. 1-2, p. 37]

The X-ray in question [Exhibit N to the complaint] was taken on March 31, 2010.  The X-ray report is on a form with the heading "DIANAssociates, University of Maryland, Radiology Report."  [R. 1-2, p. 56].  The reading radiologist is identified as Electra Kaloudis, M.D.  The findings and conclusions state:  "Abnormal.  – fractured fixation plate. –

nonunited mid ulnar fracture with distraction and angulation." *Id.*  It was logged into USP-McCreary on April 5, 2010.  *Id.*  The report itself does not identify who prepared it.  It simply identifies Electra Kaloudis, M.D., as the reading radiologist.  Regardless of what is contained in this X-ray report and regardless of who prepared it, it provides Peterson absolutely no basis for a *Bivens* claim against Duty Officer James Kelly.

First, as a Duty Officer, James Kelly is not associated with the Medical Department at USP-McCreary.  He is not a medical provider and would have no reason to review or have any knowledge of the two X-ray reports in question.  Second, James Kelly was in no position to assess, examine, or treat Peterson for any medical condition, as he is not qualified to do so.  Thus, James Kelly could not have been deliberately indifferent to Peterson's serious medical needs.  At best, Peterson has asserted a negligence claim against James Kelly.  Such negligence claim appears to be a garden variety state law tort claim for negligence arising under Kentucky law.  For the same reasons stated above concerning Peterson's state law negligence claim against W. Wood, the Court declines to exercise supplemental jurisdiction of any state law negligence claim Peterson might have against James Kelly.  Accordingly, the Court will dismiss without prejudice Peterson's broadly construed state law negligence claim against James Kelly.

## 11.    Claims against personnel in Medical Department as USP-McCreary

On pages 5 and 6 of his complaint, Peterson names the following health care providers at USP-McCreary as defendants:   Neil Stephens, Karen Bennett-Baker, A. Bryant, and Matthew Zagula.  [R. 1, at pp-5-6].  Additionally, on page 8 of his complaint, Peterson names Richard Ramirez as a defendant, noting that the "held the rank of Medical Doctor and was assigned to USP-McCreary's Medical Department."  [R. 1, p. 8].

In order to properly assess Peterson's *Bivens* claims against these health care providers, the Court reviewed Peterson's medical records compiled subsequent to his transfer there on December 21, 2009.  [R. 1-2, p, 29].  The chronology of these medical records follows.

On January 11, 2010, A, Bryant, PA-C, entered the following Administrative Note in Peterson's medical records:  "Patient wanting appointment with his Primary Care Provider to discuss x-rays of his right forearm and finger.  Hx of ORIF three months ago.  Patient is still in arm sling.  Patient to watch call out with his Provider.  Continue current meds and restrictions until seen by provider."  [R. 1-2, p. 38].  This Administrative Note was co-signed by James Kelly, DO.[4]  [R. 1-2, p. 39].

On January 25, 2010, Peterson went to Sick Call and requested an appointment with the eye doctor because he noticed he reported having difficulty seeing objects at a distance.  He also relayed to K. Bennett-Baker, his health care provider, that he had had surgery on his right forearm about three months ago, and he requested an x-ray to follow-up "because I can feel stuff moving in there sometimes."  [R. 1-2, p. 41].  K. Bennett-Baker documented that Peterson needed a repeat x-ray for a clinician to review and that he needed an eye exam.  She told him to watch for x-ray callout and then a follow-up appointment to discuss x-ray results and a treatment plan.  [R. 1-2, p. 42].

Peterson went to Sick Call again on March 26, 2010, complaining of nausea/vomiting that had begun the previous day.  The assessment was unspecified gastritis and gastroduodenitis.  Matthew Zagula, PA-C, was his health care provider.  He prescribed

---

[4] It is unclear why this Administrative Note was co-signed by James Kelly, a Duty Officer, who is not a health care provider in the Medical Department.  Perhaps prior to entry into Peterson's BOP medical records, it was necessary to have this Administrative Note co-signed by other prison personnel, and perhaps all other medical personnel were unavailable to co-sign at that time, and that James Kelly, DO, was the only prison personnel available at that time to co-sign this entry into Peterson's medical records.  This explanation is only speculative.  Nevertheless, regardless of the reason, it provides no basis for a *Bivens* claim against James Kelly, DO.

Loperamide for Peterson and told him to follow-up at Sick Call and at Chronic Care as needed. [R. 1-2, pp. 46-47]. Zagula also placed Peterson on work restriction for one day, confining him to his living quarters except for meals, pill line, and treatments. [R. 1-2, p. 49].

On April 5, 2010, K. Bennett-Baker entered the following Administrative Note in Peterson's medical records:

> Patient seen on 01/25/2010 for persistent pain and crepitus right forearm. Unable to locate recent xray report or film for review. Repeat xray ordered. X-ray report later located and reviewed. Findings: "Abnormal. Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw. Ballistic fragments. Non-union of fracture fragments." Will complete orthopedic consultation for evaluation and possible surgical intervention.

[R. 1-2, p. 51].

On April 11, 2011, Dr. Patrice Beliveau, an orthopedic surgeon at Premier Orthopedics and Sports Medicine in London, Kentucky, performed a consultative examination of Peterson in preparation for a second surgery on his right forearm. Her impression was "right ulna non-union with broken hardware." [R. 1-2, pp. 88-89].

On April 26, 2010, K. Bennett-Baker encountered Peterson again at Sick Call on a follow-up visit for the recent x-ray results and recommended treatment plan. [R. 1-2, p. 53]. She noted that Peterson's request for an orthopedic consultation had been approved and that he is awaiting scheduling. [R. 1-2, p. 54].

On June 14, 2010, Peterson went to Sick Call requesting to be placed on work idle for one week, until he could be seen by his Primary Care Provider for tenderness at the surgery site to his right forearm. [R. 1-2, p. 65]. A. Bryant, PA-C was his

health care provider.  A. Bryant, PA-C, placed Peterson on work idle until June 18, 2010.  [R. 1-2, p. 67].

On June 23, 2010, Peterson went to Health Services for a follow-up after his recent orthopedic appointment at the Kentucky Orthopedic Clinic with Ronald S. Dubin, M.D.  [R. 1-2, p. 69].  K. Bennett-Baker, his health care provider, made the following note in his medical record:  "To clinic for f/u after recent orthopedic appointment.  Patient asking about having a medical idle.  States he was told by the orthopedic he would need to not use his right arm until it was fixed.  Gunshot wound occurred in 1993 but did not seek medical treatment until 2009 because 'he was on the run.'  Sought treatment after becoming incarcerated."  [R. 1-2, p. 75].  K. Bennett-Baker noted that the orthopedic specialist opined that the plate should be removed and the proximal ulna should be bone grafted.  He also recommended a traumotologist and that Peterson do no strenuous activity until "this is fixed."  *Id.* K. Bennett-Baker also noted that Peterson declined the offer for a splint applied to his right forearm, and he signed a medical treatment refusal.  He was made aware of the treatment plan.  [R. 1-2, p. 76].

On this same date, June 23, 2010, K. Bennett-Baker entered a six-month Medical Duty Status for Peterson, authorizing a lower bunk for Peterson, restricting him from all sports activities, and noting that he should be scheduled for a job that does not require any use of his right arm.  She also directed that he wear a splint to right forearm at all times except when showering.  This Medical Duty Status was set to expire on December 23, 2010.  [R. 1-2, p. 78].

On October 27, 2011, Peterson went to Sick Call, complaining of pain in right forearm.  Christopher Griffis, EMT-P, was his health care provider.  [R. 1-2, p. 92].  Peterson was counseled and told to follow-up at Sick Call as needed.  *Id.*

On November 1, 2011, Peterson was admitted to St. Joseph Hospital in London, Kentucky, for surgery to repair/correct a right ulna chronic nonunion.  Dr. Patrice Beliveau, Orthopedic Surgeon, performed the surgery.  Peterson remained hospitalized until December 6, 2011.  [R. 1-2, pp. 96-97].

On November 7, 8, 10, and 14, 2011, L. Stephens, AHSA/LPN, entered Administrative Notes in Peterson's medical records to track and document Peterson's medical condition, treatment, while he was hospitalized at St. Joseph Hospital in London, Kentucky, from November 1, to December 6, 2011, following surgery to his right forearm.  [R. 1-3, pp. 2-5].

Upon Peterson's discharge from St. Joseph Hospital, he was transported to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, for a follow-up consultation with orthopedic specialists there.  [R. 1-3, pp. 6-7].  While there, Peterson received prescribed antibiotic treatment and went to Rehabilitation Services for treatment and massage therapy for the scar adhesions following his surgery.  [R. 1-3, pp. 12-13].

Peterson was returned to USP-McCreary on May 24, 2012.  On September 12, 2012, Peterson requested pain medication for pain in his right forearm.  K. Bennett-Baker was his health care provider, who made the following entry in Peterson's medical record: "During SHU rounds, asking to have some Naproxen for the chronic pain in right forearm.  History of GSW right forearm and bone graft 2011.  Pain worse with cold, damp raining environment.  Current pain scale #6/10.

"Naproxen always helps the best."  [R. 1-3, p. 20].  Ms. Bennett-Baker also made the following entry in his medical record in the section headed "Musculoskeletal:"  "No obvious deformity right forearm, but xray shows non-union of recent bone graft. Hardware in place.  Talked with MAST MD regarding any further options for surgical intervention.  He reports nothing else can be done."  [R. 1-3, pp. 20-21].  Ms. Bennett-Baker prescribed the Naproxen Peterson had requested and made this additional entry in his medical record:  "Hardware in forearm is in correct position but bone did not grow back together.  Do not play sports, do push-ups, pull-ups or apply significant weight/stress on right forearm.  Aware that no further orthopedic surgical interventions would be beneficial at this time, per MD.  [R. 1-3, p. 21].

In summary, the foregoing chronology reflects that after Peterson arrived at USP-McCreary in December of 2009, he informed the health care providers there that after he had the surgery to his right forearm in October of 2009, he was still experiencing pain and difficulty with his right forearm.  In March of 2010, Peterson received a follow-up X-ray of the right forearm.  The X-ray reports revealed non-united mid-ulnar fracture with distraction and angulation.  In April 0f 2010, the Utilization Review Committee approved the consultation for an orthopedic evaluation, which was performed in June of 2010.  The orthopedist recommended having the plate removed and the proximal ulna bone grafted.  In July 2010, the recommended surgery was approved, was scheduled, but had to be re-scheduled due to Peterson's transfer to FCI-McDowell as a trans-segregation on November 22, 2010.

Following Peterson's return to USP-McCreary in December of 2010, he was seen by Premier Orthopedics and Sports Medicine for another orthopedic

evaluation/consultation.   On November 1, 2011, Peterson was hospitalized at St. Joseph Hospital in London, Kentucky, for this recommended surgery.   He remained hospitalized there until December 6, 2011, and was then transferred to FMC-Springfield for further evaluation and recommended antibiotic therapy and received rehabilitation services from the occupational therapist.   Peterson was returned to USP-McCreary on May 24, 2012, and has been followed every six months thereafter for chronic care.

## 1.      Deliberate indifference

Although prison officials have broad administrative and discretionary authority to manage and control prisons, under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).   Accordingly, prison officials must "ensur[e] inmates receive the basic necessities of adequate food, shelter, and medical care . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).   *See also Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) ("as applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs."), citing *Estelle v. Gamble*, 429 U.S. at 103-04.

To reiterate, in order to state a claim of cruel and unusual punishment under the Eighth Amendment, a prisoner must demonstrate that prison officials were "deliberately indifferent to a prisoner's serious illness or injury . . . ." *Id*. at 105.   If prison medical staff knew of an inmate's serious medical needs, but intentionally disregarded an excessive risk of harm to the inmate, or if prison guards or medical staff intentionally prevented an inmate from receiving prescribed treatment or intentionally delayed or denied him access to medical care, such conduct constitutes deliberate indifference.   *Estelle*, 429 U.S. at 104-05;

*Farmer*, 511 U.S. at 837. The Eighth Amendment prohibits mistreatment if it is tantamount to "punishment." Courts have held prison officials liable only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Perez*, 466 F.3d at 423 (*internal quotations and citation omitted*).

Peterson has failed to establish that the medical personnel at USP-McCreary have been deliberately indifferent to the medical problems he has experienced following the surgery in October of 2009 to his right forearm. The numerous pages BOP medical records accompanying Peterson's complaint reflect that medical personnel at USP-McCreary have been aware of Peterson's medical problems and that Peterson has been treated for these problems. Peterson received two outside orthopedic consultations prior to a second surgery in November of 2011, which was performed by an orthopedic surgeon in London, Kentucky. He remained hospitalized outside of the prison until December 6, 2011, when he was then transported to FMC-Springfield for continued post-surgery antibiotic treatment and rehabilitation services. Following his return to USP-McCreary in May of 2012, Peterson has continued to complain of pain in his right forearm, and pain medication has been prescribed to him. At this point, the expert medical opinion is that Peterson may have achieved his maximum recovery potential. Such a history of treatment can in no way be characterized as deliberate indifference.

## 2.     Medical Judgment

Where a prisoner challenges only matters of medical judgment or otherwise expresses a difference of opinion concerning an appropriate course of treatment, he has failed to establish a meritorious constitutional claim. *Sharpe v. Patton*, 2010 WL 227702 (E.D. Ky. 2010) ("where one medical professional differs with another as to the course of treatment, the one offering more conservative treatment does not act with either a 'culpable

state of mind' or with wantonness, under the subjective prong of the Eighth Amendment. Differences of opinion as to matters of medical judgment, negligent treatment or even medical malpractice are insufficient to state a [cognizable] claim . . .") See *also Goddard v. Terris*, 2011 WL 778474, 8 (E.D. Ky. 2011).

When the cause of action is based on an allegation that the prescribed treatment was inadequate in some way, rather than on an allegation that the prison official failed to provide the plaintiff with *any* treatment, courts traditionally have been reluctant to second-guess the medical official. *Rodriguez v. Lappin*, 2009 WL 296510 (E.D. Ky. 2009). The subjective component of the Eighth Amendment analysis "prevents medical-malpractice claims from being transformed into constitutional claims." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). *See also Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976) (court distinguished between a complaint alleging a complete denial of medical care and one where the prisoner was simply second-guessing medical judgments and attempting to constitutionalize claims sounding in tort); *Shofner v. Comacho*, 230 F.3d 1359 (6th Cir. 2000) (affirming dismissal of a case presenting a disagreement over a private surgeon's recommendation for surgery and the prison official's decision against surgery for prisoner's back problem); *Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996) (prisoner's complaints go to the adequacy of the medical care; they do not raise an issue of unnecessary and wanton infliction of pain as required under *Estelle*"); *Alexander v. Federal Bureau of Prisons*, 227 F.Supp.2d 657, 666 (E.D. Ky. 2002) ("ordering a specific type of surgery is not the appropriate function of this Court"); *Holt v. Campbell County, Ky.,* 2013 WL 2476565, 5 (E.D. Ky. 2013) ("[w]hile plaintiff would have preferred the drugs he took prior to entering the CCDC, it is well established that a difference of opinion as to the approach to an inmate's medical treatment does not demonstrate the 'deliberate indifference' necessary to

state a claim under the Eighth Amendment"); *Jennings v. Al-Dabagh*, 97 F. App'x 548 (6th Cir. 2004) (inmate's personal opinion that his medical care was substandard, or that he was not given requested treatment because of costs associated with it, raised claims of state-law medical malpractice, not constitutionally defective medical care). Thus, disputes which lie solely with the adequacy of the treatment and/or the course of treatment prescribed do not rise to the level of an Eighth Amendment claim.

In the present action, Peterson has failed to establish that the defendants were deliberately indifferent to his medical needs. He merely expresses a disagreement with the treatment that he has been provided at USP-McCreary for the medical condition and problems he has experienced following surgery to his right forearm at Barstow Community Hospital in Barstow, California, in October of 2009, prior to his arrival at USP-McCreary in December of 2009. To reiterate, Peterson has been seen and examined regularly by USP-McCreary's Health Services staff for the chronic pain in his right forearm.

Contrary to Peterson's allegations, the BOP's medical records concerning the treatment he has received for the chronic pain and other medical problems associated with his right forearm reflect that prison personnel at USP-McCreary have not disregarded or ignored his ongoing, difficult-to-manage medical problem. The medical records establish that his requests were promptly processed, he was examined, and treatment was provided. *See Hyatt v. Sewell*, 197 F. App'x 370 (5th Cir. 2006) ("although there were some delays in his treatment . . . the summary judgment evidence shows that [the plaintiff] was seen regularly, that treatment was provided, and that any delays were the result of at most negligence rather than any deliberate indifference to [the plaintiff's] serious medical needs).

At best, Peterson can only establish that he was not satisfied with the medical treatment he has received. He only presents a difference of opinion or dispute as to the

adequacy of treatment and/or the course of treatment the medical personnel at USP-McCreary have administered to him.   Peterson has failed to demonstrate that these defendants have been deliberately indifferent to his medical needs.  His claims regarding the adequacy of the medical treatment he has received concern, at most, matters of medical opinions and/or medical judgment, neither of which constitutes deliberate indifference to his medical needs.

## CONCLUSION

Accordingly, for the reasons stated above, **IT IS ORDERED** as follows:

(1)    Plaintiff Steven Peterson's complaint filed against the United States of America, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, is **DISMISSED** because the district lacks jurisdiction to consider it because it was not timely presented to the United States of America.

(2)    Plaintiff's *Bivens* claims against the Director of the BOP, Charles Samuels, Jr.; J.C. Holland, Warden; Eric Wilson, former Warden; B. Ives, former Warden; J. Ray Ormond, Assistant/Acting Warden; H. Quay, Acting Warden; Norbert Rosario, M.D., B. Barron, Hospital Administrator; Rhonda Jones, Hospital Administrator; Larry Stephens, Assistant Hospital Administrator; Electra Kaloudis, Reading Radiologist; W. Wood, 4A Counselor; and James Kelly, Duty Officer, are **DISMISSED**, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim against them for which relief can be granted.  These defendants are entitled to judgment as a matter of law on these claims.

(3)    Plaintiff's *Bivens* claims against Neil Stephens, Karen Bennett-Baker, A. Bryant-PA-C, Matthew Zagula, and Richard Ramirez, M.D., are **DISMISSED** for failure to establish that these defendants have been deliberately indifferent to Peterson's serious

medical needs, in violation of the Eighth Amendment.  These defendants are entitled to judgment as a matter of law on these claims.

(4)    Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over any state law negligence claims Peterson may have against any defendant.

(5)    Peterson's broadly construed state law negligence claims are **DISMISSED WITHOUT PREJUDICE** to his right to pursue in state court.

(6)    All claims having been resolved against all defendants, this action is **DISMISSED** and **STRICKEN** from the docket.

(7)    Judgment shall be entered in favor of the Defendants.

Dated April 13, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY