UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

| | |
|---|---|
| STEPHEN DESMUND PETERSON, a/k/a STEVEN DESMOND PATTERSON, | CIVIL ACTION NO. 6:14-CV-134-KKC |
| **Plaintiff,** | |
| v. | **MEMORANDUM OPINION** |
| | **AND ORDER** |
| UNITED STATES OF AMERICA, et al., | |
| **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

Plaintiff Stephen Desmund Peterson, a/k/a/Scott Desmond Peterson, is a federal inmate presently confined at the United States Penitentiary-McCreary ("USP")-McCreary, located in Pine Knot, Kentucky. In June 2014, Peterson filed a pro se civil rights complaint in which he asserted claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), against the United States of America, the United States Department of Justice, the Director of the Federal Bureau of Prisons ("BOP"), Norbert Rosario, M.D., a physician in the Medical Department at United States Penitentiary in Inez, Kentucky ("USP-Big Sandy"), and numerous prison personnel at the USP-McCreary. [R. 1]. Peterson alleged that he was entitled to compensatory damages under the FTCA due to the negligence and/or medical malpractice associated with surgery performed on his right forearm on October 27, 2009, while he was confined at the USP-Victorville, in Victorville, California. Dr. Louis Redix, an orthopedic surgeon in California, performed the surgery and described this procedure as "Repair of malunion of the ulna bone with bone

graft."  In his complaint, Peterson alleged that he received an "allograft" cadaver bone implant; that the source of that bone was from the Barstow, California hospital's bone bank; and that he did not consent to the receipt of a cadaver implant.  Following surgery, Peterson's arm was placed in a cast, and he remained hospitalized for a couple of days before he was returned to USP-Victorville on October 29, 2009.  Peterson further alleged that post-surgery, various prison officials were deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment to the U.S. Constitution.   Peterson sought declaratory and injunctive relief and compensatory damages.[1]

In the screening Order of January 22, 2015, the Court indicated that Peterson's *Bivens* claim should go forward and that the named USP-McCreary and USP-Big Sandy defendants must respond to Peterson's complaint [R. 8, p. 7].  The Court did not, however, instruct the Clerk of the Court to issue summons for those defendants or direct the United States Marshals Service ("USMS") to serve them, but stated that the matter would stand submitted for completion of the initial screening.  [*Id.*, p. 15, ¶ 6]

After completing the screening process relative to Peterson's remaining claims, pursuant to 28 U.S.C. § 1915(e)(2) and 1915A, the Court entered a Memorandum Opinion and Order ("the Opinion and Order") and Judgment [R. 12; R. 13] on April 13, 2016,

---

[1]  Peterson also asserted claims against various prison officials employed at: (1) United States Penitentiary-Victorville ("USP-Victorville") in Adelanto, California, (2) the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC-Oklahoma"), and (3) the Federal Medical Center ("FMC")- Springfield, located in Springfield Missouri, as well as state law claims for negligence and/or medical malpractice against Dr. Louis Redix, various other hospital staff at Barstow Community Hospital, a hospital located in Barstow, California, and Dr. Patrice Beliveau, an orthopedic surgeon in London, Kentucky.  In the first screening Order entered on January 22, 2015 [R. 8], the Court severed Peterson's claims against prison officials and employees in BOP institutions outside of Kentucky and transferred them to other judicial districts, and dismissed his state law claims for negligence against medical personnel in California and Kentucky, without prejudice to his right to refile those claims in the state courts of California and Kentucky.  [*Id.*]

dismissing Peterson's remaining FTCA and *Bivens* claims. In the Opinion and Order, the Court twice summarized Peterson's protracted medical issues and his treatment while in the BOP's care, *see* R. 12, pp. 2-6; pp. 28-32, and dismissed with prejudice Peterson's FTCA claims as time-barred and dismissed Eighth Amendment *Bivens* claims against the Director of the BOP, the present and former Warden of USP-McCreary; the Assistant Acting Warden and the Acting Warden of USP-McCreary; Dr. Norbert Rosario, physician, USP-Big Sandy;[2] "B." Barron, USP-McCreary Hospital Administrator; Rhonda Jones, USP-McCreary Hospital Administrator; Larry Stephens, USP-McCreary Hospital Administrator; Reading Radiologist; "W." Wood, 4A Counselor, USP-McCreary; James Kelly, Duty Officer, USP-McCreary. The dismissal was based on the fact that these defendants either were not trained medical providers who were directly involved in the medical treatment Peterson received while he was confined at USP-McCreary, or that they held administrative positions at the prison or within the BOP, and thus could not be held vicariously liable for any alleged Eighth Amendment violations under the theory of *respondent superior*. [R. 12, pp. 13-21; pp. 23-27][3]

---

[2] USP-Big Sandy is located in Inez, Kentucky. As noted in the Opinion and Order, the fact that Peterson named Dr. Rosario as a defendant was perplexing, because Peterson was confined at USP-McCreary, not USP-Big Sandy; Dr. Rosario is a medical officer at USP-Big Sandy, and was not a medical officer at USP-McCreary during any time relevant to the complaint; and Peterson did not allege that he was ever confined in USP-Big Sandy or that Dr. Rosario ever treated or examined him. [R. 8, p. 17]

[3] The Court also dismissed Peterson's *Bivens* claims against Defendant Electra Kaloudis, who Peterson identified as the "Reading Radiologist" assigned to USP-McCreary's medical department [R. 12. pp. 23-24] Peterson had claimed that Electra Kaloudis was negligent and deliberately indifferent to his serious needs by failing to inquire into his work status after reviewing x –ray No. 201003310852127003965, which was taken on March 31, 2010, and by also failing to inform the prison Medical Department of his condition. [R. 1, p. 24]. Peterson alleged that Kaloudis's failure to pass information along to the Medical Department constituted deliberate indifference to his serious medical needs and caused more damage to his arm because he was still working in UNICOR and complaining of pain in his arm, and that if Kaloudis had informed Health Services of this X-ray, he could have been removed from his prison job to prevent more pain, suffering, and damage to his forearm. The Court noted in the Opinion and Order, the X-ray report was on a form with the heading "DIANAssociates, University of Maryland, Radiology Report." [R. 8, p. 23 (citing R. 1-2, p. 56)]. The reading radiologist was identified as Electra Kaloudis, M.D., and the findings and conclusions stated: "Abnormal.—

The Court also dismissed with prejudice Peterson's Eighth Amendment *Bivens* claims against four health-care providers at USP-McCreary: Neil Stephens; Karen Bennett-Baker; "A." Bryant; and Matthew Zagula.  [R. 12, pp. 27-37]  The Court concluded that the medical records demonstrated that the medical personnel at USP-McCreary provided ongoing treatment for the various problems which Peterson experienced following the surgery to his right forearm in October of 2009, which treatment included, but was not limited to: periodic in house assessments and evaluations; two outside orthopedic consultations; and a second surgery to repair his arm, which an orthopedic surgeon in London, Kentucky, performed in November of 2011.  [*Id.*, p. 34]  The Court explained that because Peterson received such ongoing medical care from the USP-McCreary medical providers, these defendants were not deliberately indifferent to his serious medical condition, and thus did not violate his Eighth Amendment rights.

The Court noted that Peterson remained hospitalized outside of USP-McCreary until December 6, 2011, when he was transported to FMC-Springfield for continued post-surgery antibiotic treatment and rehabilitation services; that upon his return to USP-McCreary in May of 2012, Peterson complained of pain in his right forearm but was prescribed pain medication; and that as of April 13, 2016, Peterson may have achieved his maximum

---

fractured fixation plate.–nonunited mid ulnar fracture with distraction and angulation." [*Id.*] When the X-ray report was prepared, it did not list the correct BOP Register number for Peterson, a typographical error which resulted in the USP-McCreary medical staff being initially unable to locate the X-ray report.  [R. 12, p. 23]  The X-ray report was logged into USP-McCreary on April 5, 2010.  [*Id.*]  The Court concluded that regardless of what was contained in that X-ray report or who prepared it, Peterson stated no *Bivens* claim against Kaloudis, irrespective of whether she was on the medical staff at USP-McCreary because as the reading radiologist, her function is simply to read and report what the X-ray shows; that Kaloudis was under no obligation to alert medical personnel at USP-McCreary of her findings and was simply obligated to report her findings on the X-ray report.  Nothing more was required or expected of her; and that medical records showed that Kaloudis did not examine or treat Peterson.  [Id., p. 24]

recovery potential, based on the medical evidence.  [*Id.*]   Given those facts, the Court determined that Peterson had not established that the USP-McCreary medical defendants were deliberately indifferent to his serious medical needs.  [*Id.*]

Further, the Court observed that Peterson disagreed with the decisions made at USP-McCreary as to his medical treatment, but concluded that his disagreement amounted to nothing more than second-guessing and/or a difference of opinion or dispute as to adequacy of treatment which he received while confined at USP-McCreary, and as such, his complaints did not rise to the level of deliberate indifference to a serious medical need under the Eighth Amendment.  [*Id.*, pp. 34-35]   The Court reiterated that the BOP's medical records relating to the treatment which Peterson received for the medical problems stemming from the October 2009 surgery to his right forearm reflect that the USP-McCreary medical staff did not disregard or ignore Peterson's chronic and difficult-to-manage medical problem, and that contrary to Peterson's assertions, the USP-McCreary medical staff promptly processed all of his medical complaints; examined him on numerous occasions; had Peterson examined by outside specialists; authorized the surgery by an outside specialist, which Peterson underwent in November 2011, and provided Peterson with extensive and on-going follow-up medical treatment.  [*Id.*]

Peterson has now filed a motion [R. 14] pursuant to Federal Rule of Civil Procedure 59(e), seeking reconsideration of the Opinion and Order and Judgment.[4]   Peterson alleges that the Court erred in dismissing his FCTA claims as time-barred, claiming that he did not know of the cause of his medical problems until November 1, 2011, when he received the report from the surgery to repair/correct the right ulna chronic nonunion which Dr. Patrice Beliveau, Orthopedic Surgeon in London, Kentucky, performed on him on

---

[4] Peterson simultaneously filed a Notice of Appeal [R. 15] of the Opinion and Order.

November 1, 2011. Peterson further alleges that the Court erred in dismissing his Eighth Amendment *Bivens* claims against the individually named defendants, claiming that they were deliberately indifferent to his serious medical needs.

As an initial matter, Peterson alleges that he "…never received as copy of the government's response to refute their evidence or to clear up the misconstrued arguments." [R. 14, p. 2, ¶ 2]   Pursuant to 28 U.S.C. § 1915(e)(2) and 1915A, the Court screened Peterson's numerous civil rights claims through **two** orders: (1) the Order entered on January 22, 2015 [R. 8], in which numerous *Bivens* claims were severed and transferred to other jurisdictions), and (2) the Opinion and Order, in which the Court screened Peterson's civil rights claims against the remaining USP-McCreary and USP-Big Sandy defendants. While the Court indicated in text of the January 22, 2015, Order that Peterson's *Bivens* claims would proceed, *see* R. 8, p. 7, it did not at that time specifically order a response from any of the USP-McCreary and/or USP-Big Sandy defendants.   Upon completing the screening process in April 2016, the Court re-examined Peterson's *Bivens* claims against the individually named USP-McCreary and USP-Big Sandy defendants and dismissed those claims, with prejudice, for failure to state a claim upon which relief could be granted. Peterson therefore has not received a response because until today, the government has not been instructed to file a response.

But as explained below, Peterson's motion for reconsideration will granted in part to allow his FTCA claims to proceed, but will be denied in other part as to his *Bivens* claims against the individually named USP-McCreary and USP-Big Sandy defendants.  The Court will also refer this proceeding to a Magistrate Judge for further disposition.

## DISCUSSION

### 1. FTCA CLAIMS

Peterson seeks reconsideration of the Opinion and Order, a final and appealable order, under Federal Rule of Civil Procedure 59(e), which provides that a judgment can be set aside or amended for one of four reasons: (1) to correct a clear error of law; (2) to account for newly discovered evidence; (3) to accommodate an intervening change in the controlling law; or (4) to otherwise prevent manifest injustice.  *See also, ACLU of Ky. v. McCreary County, Ky.*, 607 F.3d 439, 450 (6th Cir. 2010); *Gen Corp, Inc., v. American Intern. Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999); *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005).   The grant or denial of a Rule 59(e) motion "is within the informed discretion of the district court."  *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999); *see also Leisure Caviar*, 616 F.3d 612, 615 (6th Cir. 2010) ("A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion.")

With respect to Peterson's FTCA claims alleging negligence, he has satisfied the first criterion of Rule 59(e), because the Court erroneously applied the law applicable to the FTCA's statute of limitations.  After explaining that Peterson did not submit his FTCA claim (Standard Form 95) to the BOP until **October 8, 2013**, not October 8, 2012, *see* R. 12, p. 8, n. 1, the Court concluded that Peterson's tort claims were time-barred because Peterson failed to submit to submit an FTCA claim within two years of the date on which the claim accrued as required by 28 U.S.C. § 2675(a).  In the Opinion and Order, the Court stated that because Peterson failed to submit his FTCA claim to the United States of America in the time-frame prescribed by the statute, it lacked jurisdiction to consider Peterson's FTCA negligence claim  [R. 8, p. 9; p. 37, ¶ 1].

However, in April 2015, the Supreme Court held that the FTCA's statute of limitations requirements in § 2401(b) do not implicate the subject matter jurisdiction of the federal courts and that equitable tolling may save a late claim in some circumstances. *United States v. Kwai Fun Wong,* ___ U.S. ___, 135 S.Ct. 1625, 1629, 191 L.Ed.2d 533 (2015); *see also Herr v. U.S. Forest Serv.*, 803 F.3d 809, 814 (6th Cir. 2015). These cases indicate that dismissal of an FTCA claim for lack of subject matter jurisdiction on statute of limitations grounds may be inappropriate. To err on the side of caution, the Court will **partially** reopen this proceeding require the United States to respond only to Peterson's FTCA claims and address this or other applicable issues. In partially reopening this case, the Court notes that, as discussed the Opinion and Order, the present record contains medical information which suggests that as early as late 2009, and as late as April 11, 2011, Peterson knew or had reason to know of problems and wound infections stemming from his initial October 2009 malunion surgery.

In his Rule 59(e) motion, Peterson claims that he did not know about the existence of a medical problem stemming from his October 2009 surgery until he received the report from the surgery which he underwent on November 1, 2011, which report stated that he tested positive for MRSA and enterococcus *faecallis*, *see* R. 1-2, p. 96; R. 14-2, p. 2. But the medical records reveal that as early as late 2009 and as late as April 11, 2011, Peterson may have known, or may have had reason to know, of problems and wound infections stemming from his October 2009 malunion surgery.

On October 27, 2009, while Peterson was confined at USP-Victorville, he underwent surgery at Barstow Community Hospital in Barstow, California, to repair the malunion/nonunion of an ulna fracture of his right forearm; that problem apparently resulted from the imperfect healing of a bone broken which resulted from a gunshot wound

which Peterson sustained in 1993.  Peterson soon began complaining to the medical staff (at both USP-Victorville and the FTC-Oklahoma) about adverse side effects he was experiencing from the surgery, as early as November 2, 2009, *see* R. 1-2, p. 19 ("Subjective" complaints); on December 20, 2009, *see id.*, p. 27 (complaining of pain after doing push-ups); and again on December 24, 2009, *see id.*, p. 30 (complaining of swelling after doing push-ups).  On or about December 28, 2009, while Peterson was confined at the FTC-Oklahoma, an X-ray was performed on Peterson's arm, the findings of which were:  "Abnormal.  Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw. Ballistic fragments, non-union of fracture fragments."  [*Id.*, p. 31; *see also* R. 14-2, p. 5][5]  The X-ray report plainly used the words "abnormal," "failure," and "non-union," which should have conveyed the existence of a medical problem, even to a layman or a prisoner.

On January 25, 2010, Peterson reported to USP-McCreary Health Services that "…he had surgery on his right forearm approximately three months ago and wants an xray to f/u '**because I can feel stuff moving around in there sometimes**.'" [R. 1-2, p. 41 ("Subjective" complaints) (emphasis added)]  On that date, "K." Bennett-Baker, of the USP-McCreary medical staff, noted in the "Plan" section of the "Clinical Encounter" report: "History of recent surgery.  Documented hardware/healing issues.  Need repeat film for clinician to review."  [*Id.*, p. 42]  On March 26, 2010, Peterson reported to the USP-McCreary medical staff that he was still experiencing a "'cracking and popping' sound with rotation of the right forearm," and consequently, a new x-ray was requested.  [*Id.*, p. 47, "Specific Reasons for Request" (Complaints and Findings)]

---

[5]  The X-ray report is date-stamped "Dec. 30, 2009," but the computer-generated date of test spears to be December 28, 2009.  [*Id.*]

On April 5, 2010, the USP-McCreary medical staff noted that an X-ray dated March 31, 2010, revealed "Abnormal. –fractured and fixation plate. - non united mid ulnar fracture with distractions and angulation." [*Id.*, p. 56; *see also* R. 14-2, p. 6]. At a minimum, the repeated use of the word "abnormal" in this X-ray report should have alerted Peterson that problems had ensued from the October 2009 surgery. Further, On April 5, 2010, the USP-McCreary medical staff noted that Peterson made the following complaints about the condition of his arm:

> Recent orthopedic surgery for ORIF right forearm fracture, prior to arrival at USP McCreary. **Complaining of persistent pain and "feeling stuff move around inside right arm" at surgery site**. Persistent crepitation and tenderness at site. Denies new injury. Xray shows: Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw.   Ballistic fragments.   Non-union of fracture fragments." Needs orthopedic consultation for possible further surgical intervention.

[*Id.*, p. 51, "Reason for Request (for orthopedic surgery")) (emphasis added)]

Clearly, Peterson was aware by this date (April 5, 2010) that he was experiencing problems with his arm, because he described the sensation of "feeling stuff move around inside right arm" at the surgery site. Further, on April 27, 2010, Peterson asked the USP-McCreary medical staff to provide him with all of his X-ray results. *See id.*, p. 61 ("I would like a copy of my x-rays before surgery, after surgery, and now.").

On April 18, 2010, Peterson submitted an "Inmate Request to Staff" at USP-McCreary, requesting that copies of his x-rays be sent to his family doctor "to get a second opinion about my right finger and forearm." [R. 1-2, p. 60]  Peterson stated:

> I am tired of dealing with the pain and discomfort. **I know something is wrong in there because of the clicking and popping**. My finger is tender and everytime I bump it against anything, it hurts. **It's not natural for to be like this.   I need a second opinion.   I would like a copy of my x-rays to be sent out to the streets**.

[*Id.* (emphasis added)]  Thus, on April 18, 2010, Peterson demanded an outside evaluation of what appeared to be a worsening medical condition.

On June 18, 2010, Dr. Ronald S. Dubin of the Kentucky Orthopedic Clinic examined Peterson, and his impression was "non-proximal ulna with broken plate." [*Id.* at p. 69]  Dr. Dubin recommended that "the plate should be removed and the proximal ulna should be bone grafted," and (because of the prior surgery) that a traumatologist perform this procedure.  [*Id.*]  In his report, Dr. Dubin also included the following "Addendum" relating information which Peterson had told him about his condition:

> **Addendum**:  The patient indicates that his initially [sic] injury was in 1993, but he had an operation in Califonia, not USP.  **He also said there were wound infections and other things**.  I told the patient before I can make any recommendation, I would have to have all the medical records from the treatment of his right upper extremity and I have deferred this to USP to have this sent to me 50 that I can make a recommendation.  **The patient has informed me that the ulna bone has never really healed before in the past**….

[*Id.* (emphasis added)]  Peterson's comments to Dr. Dubin clearly signal that on June 18, 2010, he was aware that his October 2009, surgery site had not properly healed, and that he was aware that of "wound infections" and "other things" (presumably meaning "problems") stemming from his October 2009 surgery.

On June 23, 2010, Peterson again reported to the USP-McCreary Health Services, at which time the medical staff noted:

> To clinic for flu after recent orthopedic appointment. Patient asking about having a medical idle.  **States he was told by the orthopedic he would need to not use his right arm until it was fixed**.  Gunshot wound occurred in 1993 but did not seek medical treatment until 2009 because "he was on the run."  Sought treatment after becoming incarcerated.

[R. 1-2, p. 75 ("Subjective" complaint)]  The prison medical staff further noted:

> Patient states that he does not want to wear a splint because that would show a sign of weakness and he does not want anyone to know that he has a

11

disability because of safety concerns inside the prison. He will notify clinician if he changes his mind.

Again, Peterson's comments to the prison medical staff appear to indicate that on June 23, 2010, he was aware of the problems with his right arm; that he was aware that his arm needed to be "fixed," but that he was unwilling to wear a splint for fear that other prisoners would perceive him as weak.

On April 11, 2011, Dr. Patrice Beliveau, an orthopedic surgeon at Premier Orthopedics and Sports Medicine in London, Kentucky, examined and consulted with Peterson in preparation for a second surgery on his right forearm; her impression at that time was "right ulna non-union with broken hardware." [*Id.*, at p. 88]. Dr. Beliveau provided the following history of information which Peterson communicated to her:

> **HISTORY**
> The patient states that in 1993 he sustained a gunshot wound to his right forearm. At that time he was treated conservatively with casting after the bullet was removed. This did result in a [sic] isolated ulna fracture. The patient states that he had continued pain and subsequently had a malunion correction in 2009. **Following this surgery the patient reports that he developed an open wound with bloody purulent discharge, however he was not treated with antibiotics. The wound subsequently closed. He bad continual pain and swelling and was eventually diagnosed with a broken hardware and non-union**. The patient was subsequently referred to our services for further investigation.

[*Id.*] Further, in the section of her report captioned "Plan of Care," Dr. Beliveau specifically discussed with Peterson his history of infections, stating as follows:

> **PLAN OF CARE**
> **We discussed the findings and treatment options today with the patient. Given his history of questionable infection** we have recommended initial blood work: to include WBC, CRPt and ESR...This patient was counseled bout condition. **Patient verbalized understanding of the current plan of care and is agreeable.**

[*Id.*, at p. 89]

These medical entries reflect that by April 11, 2011, Peterson may have been aware of facts indicating that his right arm had not healed properly from the October 2009 surgery, and that he was experiencing infection and bloody discharge from the site.  The general rule is that a tort claim under the FTCA accrues at the time of a plaintiff's injury. *United States v. Kubrick*, 444 U.S. 111, 120 (1979); *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009); *see also Blakely v. United States*, 276 F.3d 853, 865 (6th Cir. 2002) (finding that the plaintiffs' claim accrued "when they discovered or had reason to discover that their property allegedly had been fraudulently forfeited.").  When a plaintiff knows, or in the exercise of reasonable diligence should know, of the fact that he has been injured and who has caused his injury, his claim has accrued, regardless of whether he knows the legal basis for such a claim.  *Hertz*, 560 F.3d at 618-19.

Peterson did not undergo his second/corrective surgery until November 1, 2011, but the medical records which he submitted reveal that he may have been put on inquiry notice that the bone in his arm had not healed properly (from the October 2009 surgery) as early as December 21, 2009, and as late as April 11, 2011, when he was examined and evaluated by Dr. Patrice Beliveau.  But Peterson did not submit his FTCA tort claim to the BOP until October 8, 2013.  Peterson now claims, in his Rule 59(e) motion that he did not have actual notice as to exactly who or what was to blame for his orthopedic condition until he obtained the written report from his November 1, 2011, surgery, but again, the record contains information which suggests that by April 11, 2011, Peterson knew or had reason to know of problems and wound infections stemming from his October 2009 malunion surgery.  But in an abundance of caution, the Court will partially reopen this proceeding and require the United States to respond to Peterson's FTCA negligence claims and address any and all issues relative to those claims.

### 2. CONSTITUTIONAL CLAIMS ASSERTED UNDER *BIVENS*

Although the Court initially indicated that the USP-McCreary and USP-Big Sandy defendants should be required to respond to Peterson's *Bivens* claims, *see* R. 8, p. 7, the Court subsequently and properly dismissed Peterson's *Bivens* claims against the remaining individually named defendants for the detailed reasons explained in the Opinion and Order. The Court will not reopen this proceeding to allow Peterson's *Bivens* claims against the individually named USP-McCreary and USP-Big Sandy defendants to proceed. To the extent that Peterson challenges the Court's dismissal of those *Bivens* claims and continues to assert that the individually named defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, he essentially re-packages and re-asserts the same unavailing arguments which he unsuccessfully asserted in his original complaint, arguments which this Court has squarely addressed and rejected. A litigant cannot successfully employ such a tactic under Rule 59(e), because that rule "…is not designed to give an unhappy litigant an opportunity to re-litigate matters already decided." *Gascho v. Global Fitness Holdings, LLC*, 918 F. Supp.2d 708, 714 (S. D. Ohio 2013); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998) (stating that "[a] motion under Rule 59(e) is not an opportunity to re-argue a case").

Peterson has not satisfied the second criteria of Rule 59(e), because he has not alleged the existence of newly discovered evidence as to his *Bivens* claims; he merely reiterates the claims asserted in his original complaint. Third, Peterson has not alleged an intervening change in the controlling law, as required under the third prong of Rule 59(e). Given the facts as set forth in the Opinion and Order as to Peterson's *Bivens* claims, and the fact that the Court is partially reopening this proceeding to allow Peterson's FTCA claims to proceed, he has not established that the dismissal of his *Bivens* claims will subject

14

him to manifest injustice, which is required under the fourth prong of Rule 59(e).   The "manifest injustice" ground is "an amorphous concept with no hard line definition," *see In re Henning*, 420 B.R. 773, 785 (Bankr. W. D. Tenn. Nov. 6, 2009) (citing *United States v. Jarnigan*, No. 3:08-CR-7, 2008 WL 2944902, at *2 (E.D. Tenn. June 19, 2008)), and appears to be a catch-all provision, but it is not meant to allow a disappointed litigant to attempt to persuade the Court to change its mind.   *See*, *e.g.*, *GenCorp*, 178 F.3d at 834.   Generally, a finding of manifest injustice or a clear error of law requires "unique circumstances," such as complete failure to address an issue or claim, *McWhorter v. ELSEA, Inc.*, No. 2:00-CV-473, 2006 WL 3483964, at *2 (S.D. Ohio Nov. 30, 2006) (citing *Collison v. Int'l Chem. Workers Union, Local 217*, 34 F.3d 233, 236 (4th Cir. 1994)), but such unique circumstances do not exist in this case.

In summary, for the reasons set forth above, the Court determines that Peterson's motion seeking reconsideration of the Opinion and Order will **granted in part** to allow his FTCA claims to proceed, but will be **denied in other part** as to his *Bivens* claims against the individually named USP-McCreary and USP-Big Sandy defendants.   The Clerk of the Court will be directed to issue summons for the United States, and because Peterson has been granted *pauper* status, *see* R. 7, the USMS will be instructed to serve the United States as set forth below.   Fed. R. Civ. P. 4(c)(3); 28 U.S.C. § 1915(d).

## CONCLUSION

Accordingly, the Court being advised, **IT IS ORDERED** that:

(1)     The motion for reconsideration filed by Plaintiff Stephen Desmund Peterson, a/k/a/Scott Desmond Peterson [R. 14] is **GRANTED in PART and DENIED in PART**, as follows: (a) the April 13, 2016, Memorandum Opinion and Order and Judgment docketed at R. 12, at pp. 6-9; p. 37, ¶ 1, is **PARTIALLY SET ASIDE** to allow Peterson's FTCA

negligence claims against the United States of America to proceed; and (b) Peterson's motion for reconsideration as to the dismissal of his constitutional claims asserted under 28 U.S.C. § 1331, pursuant to the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), is **DENIED**, and the dismissal of Peterson's *Bivens* claims against the individually named USP-McCreary and USP-Big Sandy defendants as set forth in the Opinion and Order (docketed at R. 12) remains in **FULL FORCE AND EFFECT**.

(2)     A Deputy Clerk in the London Clerk's Office shall prepare a "Service Packet" consisting of the following documents for service of process upon the United States of America:

        a.     a completed summons form;

        b.     the Complaint [R. 1]; the Memorandum Opinion and Orders entered herein on January 22, 2015 [R. 8] <u>and</u> on April 16, 2016 [R.12];

        c.     this Memorandum Opinion and Order; and

        d.     a completed USM Form 285.

(3)     The London Deputy Clerk shall deliver the "Service Packet" to the USMS in Lexington, Kentucky, and note in the docket the date that the Service Packet was delivered.

(4)     The USMS shall serve the United States of America by sending a Service Packet by certified or registered mail to:

        a.     the Civil Process Clerk at the Office of the United States Attorney for the Eastern District of Kentucky;

        b.     the Office of the Attorney General of the United States in Washington, D.C.; and,

           c.     the Central Office of the Federal Bureau of Prisons in Washington, D.C.

(5)    Peterson must immediately advise the Court of any change in his current mailing address.  Failure to do so may result in the dismissal of this case.

(6)    Peterson must communicate with the Court solely through notices or motions filed with the Clerk of the Court.  **The Court will disregard correspondence sent directly to the judge's chambers**.

(7)    With every notice or motion filed with the Court, Buford must (a) mail a copy to the defendant (or the defendant's attorney); and (b) at the end of the notice or motion, certify that he has mailed a copy to the defendant (or the defendant's attorney) and the date on which this was done.  The Court will disregard any notice or motion which does not include this certification.

(8)    Pursuant to 28 U.S.C. § 636(b), this matter is **REFERRED** to a United States Magistrate Judge for all further disposition, to establish a discovery and dispositive motions schedule, if or when required, and to conduct all further proceedings, and prepare proposed findings of fact and recommendations on any dispositive motions.

(9)    The Clerk of the Court shall **ASSIGN** this matter to a Magistrate Judge.

(10)    The Clerk of the Court shall **TRANSMIT** a copy of this Order to the Clerk of the Court of Appeals for the Sixth Circuit, referencing Case No. 16-5500.

Dated October 18, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY