UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| STEPHEN DESMUND PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:14-CV-134-KKC-REW |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION[1] |
| UNITED STATES  OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The United States moved to dismiss *pro se*[2] Plaintiff Stephen Desmund Peterson's FTCA claim or, in the alternative, for summary judgment. DE #23 (Motion). Peterson responded in opposition. DE #33 (Response). The United States replied. DE #35 (Reply). Peterson, without authorization, surreplied. DE #38 (Surreply). The matter is ripe for consideration. For the following reasons, the Court **RECOMMENDS** that the District Judge **GRANT** DE #23 to the extent it seeks timeliness-based dismissal.

I.    **BACKGROUND**

In June 2014, Stephen Peterson, a federal inmate, filed the present Complaint, which raised a variety of claims against numerous Defendants. DE #1. The District Court twice screened the Complaint, *see* DE ##8 and 12, and ultimately struck the case from the docket. DE #13 (Judgment). On Plaintiff's prompt motion, however, Judge Caldwell later reopened solely Peterson's FTCA claim. *See* DE #17, at 7-13, 15-16. The Marshal

---

[1] Chief Judge Caldwell referred this matter to the undersigned to conduct all further pretrial proceedings, including preparation of a Report and Recommendation regarding any dispositive motion. *See* DE #17, at 17.

[2] The Court evaluates a complaint by a *pro se* plaintiff under a relatively lenient standard. *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) ("Pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings.").

completed service, DE #22 (Returned Summons), and the United States filed a motion to dismiss and, alternatively, for summary judgment. DE #23. Peterson responded. DE #33. The Government replied. DE #35. Peterson surreplied. DE #38.

Judge Caldwell has already catalogued the alleged facts[3] underlying the FTCA claim; the Court could not improve her summary and so will excerpt it extensively:

> Peterson alleged that he was entitled to compensatory damages under the FTCA due to the negligence and/or medical malpractice associated with surgery performed on his right forearm on October 27, 2009, while he was confined at the USP-Victorville, in Victorville, California. Dr. Louis Redix, an orthopedic surgeon in California, performed the surgery and described this procedure as "Repair of malunion of the ulna bone with bone graft." In his complaint, Peterson alleged that he received an "allograft" cadaver bone implant; that the source of that bone was from the Barstow, California hospital's bone bank; and that he did not consent to the receipt of a cadaver implant. Following surgery, Peterson's arm was placed in a cast, and he remained hospitalized for a couple of days before he was returned to USP-Victorville on October 29, 2009.

*Peterson v. United States*, No. 6:14-CV-134-KKC, 2016 WL 6090733, at *1 (E.D. Ky. Oct. 18, 2016). The District Court later explained the basis for reopening the FTCA claim:

> With respect to Peterson's FTCA claims alleging negligence, . . . the Court erroneously applied the law applicable to the FTCA's statute of limitations. After explaining that Peterson did not submit his FTCA claim (Standard Form 95) to the BOP until **October 8, 2013**, not October 8, 2012, see R. 12, p. 8, n. 1, the Court concluded that Peterson's tort claims were time-barred because Peterson failed to submit . . . an FTCA claim within two years of the date on which the claim accrued as required by 28 U.S.C. § 2675(a). In the Opinion and Order, the Court stated that because

---

[3] The Court reviews the complaint in the context of a motion to dismiss and alternatively for summary judgment. Under the standard for a motion to dismiss, the Court construes the complaint in favor of Peterson, the non-movant, and assumes the well-pled facts are true. *Gilley v. Dunaway*, 572 F. App'x 303, 305-06 (6th Cir. 2014). Under the summary judgment standard, the Court assesses the facts in favor of Peterson, the non-movant. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (citation and internal quotation marks omitted).

Peterson failed to submit his FTCA claim to the United States of America in the time-frame prescribed by the statute, it lacked jurisdiction to consider Peterson's FTCA negligence claim [R. 8, p. 9; p. 37, ¶ 1].

However, in April 2015, the Supreme Court held that the FTCA's statute of limitations requirements in § 2401(b) do not implicate the subject matter jurisdiction of the federal courts and that equitable tolling may save a late claim in some circumstances. *United States v. Kwai Fun Wong*, ___ U.S. ____, 135 S. Ct. 1625, 1629, 191 L. Ed. 2d 533 (2015); *see also Herr v. U.S. Forest Serv.*, 803 F.3d 809, 814 (6th Cir. 2015). These cases indicate that dismissal of an FTCA claim for lack of subject matter jurisdiction on statute of limitations grounds may be inappropriate. To err on the side of caution, the Court will partially reopen this proceeding[,] require the United States to respond only to Peterson's FTCA claims[,] and address this or other applicable issues. In partially reopening this case, the Court notes that, as discussed the Opinion and Order, the present record contains medical information which suggests that as early as late 2009, and as late as April 11, 2011, Peterson knew or had reason to know of problems and wound infections stemming from his initial October 2009 malunion surgery.

*Id.* at *4 (emphasis in original). Judge Caldwell had originally observed: "While Peterson may not have known on October 27, 2009, the date of the initial surgical repair and allograft implant, that he had been injured at that time, **it is clear that he had reason to know or should have known several weeks thereafter that there were problems associated with his surgery**, given the pain he was experiencing and the fact that the healing process appeared to be impaired." *Peterson v. United States*, 6:14-CV-134-KKC, 2016 WL 1493069, at *5 (E.D. Ky. Apr. 13, 2016) (emphasis added). The District Judge continued reviewing the record evidence, a pertinent discussion the Court here recounts at length because it captures much of the key background:

On October 27, 2009, while Peterson was confined at USP-Victorville, he underwent surgery at Barstow Community Hospital in Barstow, California, to repair the malunion/nonunion of an ulna fracture of his right forearm; that problem apparently resulted from the imperfect healing of a bone broken [sic] which resulted from a gunshot wound which Peterson sustained in 1993. Peterson soon began complaining to the medical staff (at both USP-Victorville and the FTC-Oklahoma) about adverse side effects he was experiencing from the surgery, as early as November 2,

3

2009, *see* R. 1-2, p. 19 ("Subjective" complaints); on December 20, 2009, *see id.*, p. 27 (complaining of pain after doing push-ups); and again on December 24, 2009, *see id.*, p. 30 (complaining of swelling after doing push-ups). On or about December 28, 2009, while Peterson was confined at the FTC-Oklahoma, an X-ray was performed on Peterson's arm, the findings of which were: "Abnormal. Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw. Ballistic fragments, non-union of fracture fragments." [*Id.*, p. 31; *see also* R. 14-2, p. 5].[4] The X-ray report plainly used the words "abnormal," "failure," and "non-union," which should have conveyed the existence of a medical problem, even to a layman or a prisoner.

On January 25, 2010, Peterson reported to USP-McCreary Health Services that ". . . he had surgery on his right forearm approximately three months ago and wants an xray to f/u '**because I can feel stuff moving around in there sometimes**.' " [R. 1-2, p. 41 ("Subjective" complaints) (emphasis added)]. On that date, "K." Bennett-Baker, of the USP-McCreary medical staff, noted in the "Plan" section of the "Clinical Encounter" report: "History of recent surgery. Documented hardware/healing issues. Need repeat film for clinician to review." [*Id.*, p. 42]. On March 26, 2010, Peterson reported to the USP-McCreary medical staff that he was still experiencing a "'cracking and popping' sound with rotation of the right forearm," and consequently, a new x-ray was requested. [*Id.*, p. 47, "Specific Reasons for Request" (Complaints and Findings)].

On April 5, 2010, the USP-McCreary medical staff noted that an X-ray dated March 31, 2010, revealed "Abnormal. -fractured and fixation plate. – non united mid ulnar fracture with distractions and angulation." [*Id.*, p. 56; *see also* R. 14-2, p. 6]. At a minimum, the repeated use of the word "abnormal" in this X-ray report should have alerted Peterson that problems had ensued from the October 2009 surgery. Further, On April 5, 2010, the USP-McCreary medical staff noted that Peterson made the following complaints about the condition of his arm:

> Recent orthopedic surgery for ORIF right forearm fracture, prior to arrival at USP McCreary. **Complaining of persistent pain and "feeling stuff move around inside right arm" at surgery site**. Persistent crepitation and tenderness at site. Denies new injury. Xray shows: Suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd most distal screw. Ballistic fragments. Non-union of

---

[4] The X-ray report is date-stamped "Dec. 30, 2009," but the computer-generated date of test [ap]pears to be December 28, 2009. [*Id.*]

fracture fragments." Needs orthopedic consultation for possible further surgical intervention.

[*Id.*, p. 51, "Reason for Request (for orthopedic surgery)" (emphasis added)].

Clearly, Peterson was aware by this date (April 5, 2010) that he was experiencing problems with his arm, because he described the sensation of "feeling stuff move around inside right arm" at the surgery site. Further, on April 27, 2010, Peterson asked the USP-McCreary medical staff to provide him with all of his X-ray results. *See id.*, p. 61 ("I would like a copy of my x-rays before surgery, after surgery, and now.").

On April 18, 2010, Peterson submitted an "Inmate Request to Staff" at USP-McCreary, requesting that copies of his x-rays be sent to his family doctor "to get a second opinion about my right finger and forearm." [R. 1-2, p. 60]. Peterson stated:

> I am tired of dealing with the pain and discomfort. **I know something is wrong in there because of the clicking and popping**. My finger is tender and everytime I bump it against anything, it hurts. **It's not natural for to be like this. I need a second opinion. I would like a copy of my x-rays to be sent out to the streets**.

[*Id.* (emphasis added)]. Thus, on April 18, 2010, Peterson demanded an outside evaluation of what appeared to be a worsening medical condition.

On June 18, 2010, Dr. Ronald S. Dubin of the Kentucky Orthopedic Clinic examined Peterson, and his impression was "non-proximal ulna with broken plate." [*Id.* at p. 69] Dr. Dubin recommended that "the plate should be removed and the proximal ulna should be bone grafted," and (because of the prior surgery) that a traumatologist perform this procedure. [*Id.*]. In his report, Dr. Dubin also included the following "Addendum" relating information which Peterson had told him about his condition:

> **Addendum**: The patient indicates that his initially [sic] injury was in 1993, but he had an operation in California, not USP. **He also said there were wound infections and other things**. I told the patient before I can make any recommendation, I would have to have all the medical records from the treatment of his right upper extremity and I have deferred this to USP to have this sent to me 50 that I can make a recommendation. **The patient has informed me that the ulna bone has never really healed before in the past**....

5

[*Id.* (emphasis added)]. Peterson's comments to Dr. Dubin clearly signal that on June 18, 2010, he was aware that his October 2009, surgery site had not properly healed, and that he was aware that of "wound infections" and "other things" (presumably meaning "problems") stemming from his October 2009 surgery.

On June 23, 2010, Peterson again reported to the USP-McCreary Health Services, at which time the medical staff noted:

> To clinic for flu after recent orthopedic appointment. Patient asking about having a medical idle. **States he was told by the orthopedic he would need to not use his right arm until it was fixed**. Gunshot wound occurred in 1993 but did not seek medical treatment until 2009 because "he was on the run." Sought treatment after becoming incarcerated.

[R. 1-2, p. 75 ("Subjective" complaint)]. The prison medical staff further noted:

> Patient states that he does not want to wear a splint because that would show a sign of weakness and he does not want anyone to know that he has a disability because of safety concerns inside the prison. He will notify clinician if he changes his mind.

Again, Peterson's comments to the prison medical staff appear to indicate that on June 23, 2010, he was aware of the problems with his right arm; that he was aware that his arm needed to be "fixed," but that he was unwilling to wear a splint for fear that other prisoners would perceive him as weak.

On April 11, 2011, Dr. Patrice Beliveau, an orthopedic surgeon at Premier Orthopedics and Sports Medicine in London, Kentucky, examined and consulted with Peterson in preparation for a second surgery on his right forearm; her[5] impression at that time was "right ulna non-union with broken hardware." [*Id.*, at p. 88]. Dr. Beliveau provided the following history of information which Peterson communicated to her:

### HISTORY

> The patient states that in 1993 he sustained a gunshot wound to his right forearm. At that time he was

---

[5] The Court's research indicates that Dr. Beliveau is a man. *See* Patrice Beliveau, M.D., http://www.kentuckyonehealth.org/body.cfm?id=5120&action=detail&ref=1780 (last visited May 22, 2017).

> treated conservatively with casting after the bullet was removed. This did result in a [sic] isolated ulna fracture. The patient states that he had continued pain and subsequently had a malunion correction in 2009. **Following this surgery the patient reports that he developed an open wound with bloody purulent discharge, however he was not treated with antibiotics. The wound subsequently closed. He bad continual pain and swelling and was eventually diagnosed with a broken hardware and non-union**. The patient was subsequently referred to our services for further investigation.

[*Id.*]. Further, in the section of her report captioned "Plan of Care," Dr. Beliveau specifically discussed with Peterson his history of infections, stating as follows:

> **PLAN OF CARE**
>
> **We discussed the findings and treatment options today with the patient. Given his history of questionable infection** we have recommended initial blood work: to include WBC, CRPt and ESR...This patient was counseled bout condition. **Patient verbalized understanding of the current plan of care and is agreeable.**

[*Id.*, at p. 89].

These medical entries reflect that by April 11, 2011, Peterson may have been aware of facts indicating that his right arm had not healed properly from the October 2009 surgery, and that he was experiencing infection and bloody discharge from the site. The general rule is that a tort claim under the FTCA accrues at the time of a plaintiff's injury. *United States v. Kubrick*, 444 U.S. 111, 120 (1979); *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009); *see also Blakely v. United States*, 276 F.3d 853, 865 (6th Cir. 2002) (finding that the plaintiffs' claim accrued "when they discovered or had reason to discover that their property allegedly had been fraudulently forfeited."). When a plaintiff knows, or in the exercise of reasonable diligence should know, of the fact that he has been injured and who has caused his injury, his claim has accrued, regardless of whether he knows the legal basis for such a claim. *Hertz*, 560 F.3d at 618-19.

Peterson did not undergo his second/corrective surgery until November 1, 2011, but the medical records which he submitted reveal that he may have been put on inquiry notice that the bone in his arm had not healed properly (from the October 2009 surgery) as early as December 21, 2009, and as late as April 11, 2011, when he was examined and evaluated by Dr.

Patrice Beliveau. But Peterson did not submit his FTCA tort claim to the BOP until October 8, 2013. Peterson now claims, in his Rule 59(e) motion that he did not have actual notice as to exactly who or what was to blame for his orthopedic condition until he obtained the written report from his November 1, 2011, surgery, but again, the record contains information which suggests that by April 11, 2011, Peterson knew or had reason to know of problems and wound infections stemming from his October 2009 malunion surgery. But in an abundance of caution, the Court will partially reopen this proceeding and require the United States to respond to Peterson's FTCA negligence claims and address any and all issues relative to those claims.

*Peterson*, 2016 WL 6090733, at *5-*7 (all as in original, including the first footnote); *see also Peterson v. United States*, No. 6:14-CV-134-KKC, 2015 WL 278093, at *2-*4 (E.D. Ky. Jan. 22, 2015) (further describing the facts).[6] The plenary briefing now returns the Court to the analysis.

## II.    STANDARD OF REVIEW

### A.    *Motion to Dismiss*

To the extent the United States moves to dismiss Peterson's FTCA claim, the following general standard applies:

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks removed) (quoting and citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 127 S. Ct. at 1965); *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015). The Court must "construe the complaint in the light most favorable to the

---

[6] The record indicates that the second (November 2011) surgery also resulted in problems, *see, e.g.*, DE #23-9, at 119, 122, but the success or failure of that surgery is not at issue in this case.

nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). The Court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* at 336.

In this distinct FTCA statute of limitations assessment context, the questions of the Court's jurisdiction and what constitutes accrual are questions of law, although the "[u]nderlying" issue concerning the actual date of accrual "is a question of fact." *See, e.g.*, *Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1270 (10th Cir. 2002). As one district court cogently explained: "What constitutes accrual of a cause of action is a question of law, even though the specific moment when accrual occurs is generally a question for the jury. Accordingly, a court may dismiss a FTCA claim on statute of limitation grounds only if no reasonable person could disagree on the date on which the cause of action accrued." *Webb v. United States*, 535 F. Supp. 2d 54, 58 (D.D.C. 2008) (internal citations and quotation marks removed); *see also, e.g.*, *Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 307 (E.D.N.Y. 2008) ("[T]he FTCA transforms the question of claim accrual into a jurisdictional inquiry, and any disputed jurisdictional acts much be resolved by the district court."); *Cline v. United States*, No. 3:13-CV-776, 2016 WL 2653607, at *5 (M.D. Tenn. May 10, 2016) ("The determination as to when a plaintiff has such knowledge [so as to trigger accrual] is, as the Sixth Circuit has oft noted, 'necessarily fact-intensive,' and courts generally consider when a 'reasonable person' would have been aware of information sufficient to trigger accrual of the claim." (quoting *Amburgey v. United States*, 733 F.3d 633, 637-39 (6th Cir. 2013))).

### B.      Motion for Summary Judgment

To the extent the United States moves for summary judgment, the following general standard applies:

Pursuant to Federal Rule of Civil Procedure 56, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). The Rule "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to

10

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* at 106 S. Ct. at 2552.

If the movant bears the burden of persuasion at trial, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 2556 (citation omitted) (Brennan, J., dissenting); *see also Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that, when the movant also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it") (citation and internal quotation marks omitted). "If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp.*, 106 S. Ct. at 2557 (Brennan, J., dissenting) (emphasis in original).

A fact is "material" if the underlying substantive law identifies that fact, or the element it concerns, as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III.    ANALYSIS

Under the FTCA, Peterson may sue to recover "money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see also id.* §§ 2671-2680.[7] The United States primarily seeks dismissal based on alleged claim untimeliness, an issue the parties have fully briefed and the Court now considers.

### A.    *Peterson's claim is time-barred.*

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). "Ordinarily, a plaintiff's FTCA claim accrues at the time of injury." *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009) (quoting

---

[7] As the statute indicates, the law of tort location ("where the act or omission occurred") governs substantive FTCA liability. *Rousey v. United States*, 115 F.3d 394, 396 (6th Cir. 1997). The United States and Peterson agree that Kentucky law governs the substantive claim, *see* DE ##23-1, at 23; 33, at 19, but the Court need not resolve this question, at least at this procedural point, given the recommended timeliness-based dismissal. It is far from clear, to the Court, that Kentucky law would (at least solely) apply, given the California surgery and the Oklahoma events about which Peterson also complains.

*Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)). However, a claim also, in appropriate circumstances, accrues instead on an inquiry-notice basis, thus, when a plaintiff, "armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community." *United States v. Kubrick*, 100 S. Ct. 352, 360 (1979); *Hertz*, 560 F.3d at 618 (same, and calling *Kubrick* "the leading precedent concerning accrual of claims for purposes of § 2401(b)"). The Sixth Circuit has explained:

> *Kubrick* thus applied not a discovery rule (in the sense of discovering the existence of a claim) with respect to the accrual of claims under the FTCA, but an inquiry-notice rule. Specifically, a claim accrues when a plaintiff possesses enough information with respect to h[is] injury that, "had []he sought out independent legal and expert advice at that point, []he should have been able to determine in the two-year period whether to file an administrative claim." *McIntyre v. United States*, 367 F.3d 38, 53 (1st Cir. 2004); *see also Kronisch*, 150 F.3d at 121 ("a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice") (internal quotation marks omitted).

> The determination as to *when* a plaintiff has such knowledge is necessarily fact-intensive. In some cases, particularly medical-malpractice cases in which the plaintiff has little reason to suspect anything other than natural causes for his injury, a plaintiff might need to know, or have reason to know, of doctor-caused harm (though not necessarily of *negligently* doctor-caused harm) in order for his claim to accrue. *See e.g., Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985) (plaintiff's mere knowledge that her spouse died of cancer did not trigger accrual of claim for VA malpractice); *Diaz v. United States*, 165 F.3d 1337, 1341 (11th Cir. 1999) (plaintiff's knowledge of spouse's suicide, "without any indication of medical treatment beforehand," did not trigger accrual of malpractice claim).

*Hertz*, 560 F.3d at 618-19 (internal alteration omitted; citations slightly altered); *see also Amburgey v. United States*, 733 F.3d 633, 636-38 (6th Cir. 2013) (further explaining the accrual standards).

13

Per the Government, Peterson's claim implicates two separate administrative tort claims: Claim Nos. TRT-MXR-2011-03006 and TRT-MXR-2014-00048. The Court will not unnecessarily burden the record with a full description of the procedural and medical background of each. The facts critical to resolution of the United States's current motion are that the final agency denial of Claim 2011-03006 occurred on **January 12, 2012**, DE #23-4, at 13, and Peterson filed Claim 2014-00048 on **October 8, 2013**,[8] DE #23-6, at 1.

The analysis as to Claim 2011-03006 is straightforward. Simply put, per § 2401(b), Peterson had to file an action by July 12, 2012, to be timely. He did not do so. Peterson did not file until June 20*14*. Any tort claim in federal court based on the subject matter of Claim 2011-03006 is plainly time-barred.[9]

The analysis as to Claim 2014-00048, which centers on alleged malpractice as to the October 2009 surgery, presents different issues. The question is whether Peterson filed the October 8, 2013, claim within 2 years of the claim accruing. The record establishes that the answer here certainly is "no." On these facts, the claim "accrue[d]," per § 2401(b), likely in late 2009, potentially at various points in 2010, and **certainly no**

---

[8] The Court echoes Judge Caldwell's prior perception that the claim's date of "10-08-2012" appears to be a typo. *See* DE #12, at 8 n.1. Peterson concluded his claim by stating, "As of 10-09-2013, Peterson's right forearm has not heal[ed] and he is still experiencing pain in that area and elbow." DE #23-6, at 13. The BOP first responded on October 16, 2013. DE #23-6, at 21. Peterson does not dispute—and in fact agrees with—an October 2013, filing date. DE #33, at 17 ("The Plaintiff did not submit the second administrative tort claim to the BOP until October 9, 2013.").

[9] Peterson makes clear that this result is of no concern to him: "Tort claim TRT-MXR-2011-03006 is not at issue here and is used as a smoke screen by the government. This is not the claim the Plaintiff filed in the District Court[.]" DE #33, at 5; *see also id.* at 14. Given Plaintiff's abandonment of any 2011-03006-based claim in this case, the Court will not unduly linger on it in analysis.

**later than April 11, 2011**.[10] Any accrual before October of 2011 would make the claim untimely.

Both parties had the chance for full briefing on these topics. The undersigned agrees with the Chief Judge that, from the record, "it is clear that [Peterson] had reason to know or should have known several weeks [after the October 27, 2009, surgery] that there were problems associated with his surgery, given the pain he was experiencing and the fact that the healing process appeared to be impaired." *Peterson*, 2016 WL 1493069, at \*5; *see also* DE #1-2, at 19, 27, 30 (Peterson complaining "of pain and swelling" in November and December 2009). Indeed, the surgical site had "mild swelling and tenderness," including "a wound with minimal sero-sanguinous discharge" on November 19, 2009. DE #1-2, at 23. A critical date, to the Court, is **December 30, 2009**, when personnel performed an x-ray on Peterson in Oklahoma. The outcome was: "**Abnormal. suspected fracture/failure of malleable plate hardware** which transfixes mid-ulna fracture at the level of the 3rd most distal screw. ballistic fragments. **non-union of fracture fragments**." *Id.* at 31 (all as in original; emphases added). This December 30, 2009, x-ray plainly put Peterson on notice of probable concerns regarding the recent surgery. Had Peterson "sought out independent legal and expert advice at" the point of this x-ray (a mere 2 months post-surgery), "he should have been able to determine in the two-year period whether to file an administrative claim." *Hertz*, 560 F.3d at 618-19.

---

[10] Untimeliness was the basis of the BOP's denial of Claim 2014-00048. DE #23-6, at 21 ("You filed your tort claim . . . beyond the two-year statute of limitations. This letter is a formal denial of your claim. If you are not satisfied with this determination, you have six months from the date of this letter in which to bring suit in the appropriate U.S. District Court." (paragraph break removed)); *see also* DE #23-6, at 28-30 (letter rejecting "administrative settlement" of the claim). April 11, 2011, significantly post-dates many of the issues Peterson raises at DE #33, at 10-11.

The next critical date to the Court is **January 25, 2010**. Then, Peterson reported to the Bureau of Prisons that "he had surgery on his right forearm approximately three months ago and wants an xray . . . '**because I can feel stuff moving around in there sometimes**.'" DE #1-2, at 41 (emphasis added). Peterson made a similar complaint about "cracking/popping" sounds when he rotated his right forearm on March 26, 2010. *Id.* at 47.

Next, on **April 5, 2010**, BOP staff explicitly reviewed the prior x-ray revealing abnormality with Peterson. DE #1-2, at 51. Peterson also complained "of persistent pain and 'feeling stuff move around inside right arm' at surgery site." *Id.* Staff noted the "persistent crepitation and tenderness at site." *Id.* Importantly, Peterson denied any new injury. *Id.* Staff advised of the possibility of "further surgical intervention." *Id.* An additional x-ray revealed an "abnormal," "fractured fixation plate," as well as a "nonunited mid ulnar fracture with distraction and angulation." *Id.* at 56.

Further, on **April 18, 2010**, Peterson himself demanded an outside evaluation of his medical condition: "**I am tired of dealing with the pain and discomfort. I know something is wrong in there because of the clicking and popping.** My finger is tender and everytime I bump it against anything, it hurts. **It's not natural for to be like this.** I need a second opinion. I would like a copy of my x-rays to be sent out to the streets." DE #1-2, at 60 (emphases added).

Peterson's **June 18, 2010**, comments to Dr. Dubin likewise indicate that he was aware that his October 2009 surgery site had not properly healed, that he was in "increasing . . . pain" at the surgical site, and that he was aware of prior "wound infections" and "other things" wrong from the at-issue surgery. DE #1-2, at 69. Additionally, Peterson's **June 23, 2010**, comments show his knowledge that his arm

16

needed to be "fixed." *Id.* at 75. Importantly, Peterson's filing of Claim 2011-03006 in **March 2011**, DE #23-4, at 1-2, establishes a plain date of awareness of issues regarding the 2009 surgery.

The last critical date in this timeline is **April 11, 2011**, when Peterson saw Dr. Beliveau in preparation for a second surgery. He perceived "**right ulna non-union with broken hardware**." DE #1-2, at 88-89. Dr. Beliveau reported Peterson's statement that "he had continued pain and subsequently had a malunion correction in 2009," subsequently developing "**an open wound with bloody purulent discharge**" and "**continual pain and swelling**." *Id.* at 88. Dr. Beliveau expressed a need for caution because of the "history of questionable infection." *Id.*

The Court concludes, from the evidence of Peterson's course of treatment, that Plaintiff was on inquiry notice of the claim here, at the very latest, on April 11, 2011, when Dr. Beliveau—an outside consulting doctor—diagnosed continued "right ulna non-union" and noted the "broken hardware" in Peterson's arm, as well as the prior "open wound with bloody purulent discharge." Plaintiff likely was on inquiry notice as early as December 30, 2009, when the Oklahoma x-ray revealed an "abnormal" surgical area with a "suspected fracture," continued "non-union," or "failure of . . . hardware." Indeed, Peterson acknowledged that soon after the October 2009 surgery, the "cast was blood and puss soaked[.]" DE #33, at 6; *see also id.* at 21 (Plaintiff acknowledging that he "had a[n] infection that was first discovered in 2009"); DE #33-3 (Peterson Affidavit), at 2 ("The surgery was on Oct. 27, 2009 and the infection discovered 11/19/2009, just 23 days after the surgery."); *id.* at 6. Peterson swore that he told Neil Stephens in January 2010 that the "surgery on my right arm (ulna), became infected[.]" *Id.* at 2; *see also id.* at 7. Peterson's comments about feeling "stuff moving around" in the surgical area and his comments to

17

Dr. Dubin in 2010 likewise suggest the presence of inquiry notice. Peterson explicitly said in April 2010: "*I know something is wrong in there* **because of the clicking and popping**. . . . **It's not natural for to be like this**." *See also* DE #33-3 (Peterson Affidavit), at 9 ("Plaintiff also states that he had a complete broken arm and **any lay person could look at the x-ray and see that not only the broken ulna bone was severed**, the metal plate that was put there with strews [sic] was also broken in half[.]" (emphasis added)).

Peterson, in fact, largely agrees with this analysis: "[B]y April 26, 2010, at the latest, the Plaintiff was clearly aware, via medical data, that his October 27, 2009, surgery had not healed properly[.]" DE #33, at 14. Peterson's argument, however, is that "the cause of it not healing was not discovered yet." *Id.* Peterson also asserts that the "claim accrued on August 28, 2012[,] when he rec[ei]ved a copy of the final disposition showing his serious medical condition." DE #33, at 4, 17. He particularly cites his Exhibit F to support this conclusion. *Id.* at 5. This exhibit shows that Peterson received 35 pages of material responsive to a FOIA request. DE #33-6. The substantive document he included is a December 2011 post-surgical report from Dr. Beliveau. *Id.* at 3-4.

These arguments—that Peterson knew *something* was wrong, but did not know the *precise* cause of the problem, or that accrual did not occur until his *actual* awareness of the exact medical injury—lead to no relief. Indeed, the theories runs counter to the fundamental principles behind the Sixth Circuit's inquiry-notice accrual rule. The Court of Appeals explicitly rejected the notion that a plaintiff must have discovered the actual "existence of a claim" for the 2-year period to begin running. *Hertz*, 560 F.3d at 618-19. Rather, "a claim accrues when a plaintiff possesses enough information" that, if he then "sought out independent legal and expert advice," he "should have been able to determine

in the two-year period whether to file an administrative claim." *Id.* Put another way, a claim accrues when the plaintiff "knows, **or should know**, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Id.* (emphasis added).

Here, as the Court has recounted at length, Peterson knew or should have known "enough of the critical facts" surrounding the negative surgery-related effects "to protect himself by seeking legal advice" by no later than April 11, 2011—and actually quite earlier than that. The inquiry-notice rule "does not require knowledge of all facts necessary to bring an action." *Wuliger v. Sewell*, 363 F. Supp. 2d 940, 945 (N.D. Ohio 2005). "[P]articularly in the medical-malpractice context," a plaintiff generally may "not know enough about the cause of injury to be on inquiry notice of a possible tort claim until long after the injury," *Amburgey*, 733 F.3d at 637, and that is just the case Peterson presents. Amburgey's "claim accrued when a reasonable person would know enough to prompt a deeper inquiry into a potential cause of" the injury. *Id.* at 638. So too here: Peterson's claim accrued no later than April 11, 2011, when a reasonable person would have known enough, based on all the information above, to prompt a deeper inquiry into the cause of the injury.

Peterson's attempt to tie the accrual date to the August 28, 2012,[11] document receipt showing *actual* awareness of the *precise* malady (the MRSA or other graft infection) runs counter to the Sixth Circuit's clear accrual-related commands. The Court of Appeals explained: "for accrual purposes, the 'cause' of an injury does not refer to the 'precise medical reason for the injury.'" *Id.* at 638 (quoting *Kerstetter v. United States*, 57 F.3d 362, 364 (4th Cir. 1995)). "Knowledge that an injury was a result of medical

---

[11] The Court includes in this discussion any possible Peterson argument that the accrual date was in November or December 2011, per Dr. Beliveau's December 2011 report.

treatment generally, as opposed to knowledge of the specific injurious action or omission by the physician, is sufficient for a claim to accrue." *Id.*; *see also, e.g.*, *Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 936 (8th Cir. 2002) ("[T]o be on inquiry notice, the Estate need not have conclusively known the details giving rise to its claim."); *Kronisch*, 150 F.3d at 121 ("Discovery of the critical facts of injury and causation is not an exacting requirement, but requires only knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it[,] . . . not . . . each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." (internal quotation marks removed)). Peterson certainly had sufficient "[k]nowledge that an injury was a result of medical treatment generally," under the applicable inquiry-notice standard, as explained, by April 2011 to conclusively establish claim accrual here.[12]

Without question, Peterson knew from several sources and at various x-ray confirmed points that the surgery had failed. He also knew that he had experienced a post-surgical infection and that, in his view, the arm had never fully healed. In April 2010, Plaintiff reports that he "strongly felt, something was wrong with his arm[.]" DE #23-6, at 5. Peterson showed his own organic sense of inquiry and suspicion when, in April 2010, he pursued a copy of his records for outside analysis and a "second opinion": "I know something is wrong in there . . . It's not natural for to be like this." DE #23-9, at

---

[12] Indeed, he conceded knowing "a '**POTENTIAL CAUSE**'" before the August 2012 document receipt. DE #27, at 4 (all as in original). Peterson also asks: "If a[n] infection was discovered in 2009, what type of infection was it?" DE #38, at 3. Posing the question here portends the result; the question's existence is one of many things that signify inquiry notice, per the cases.

41. In April 2010, Peterson knew the suspected surgical failure. *Id.* at 35. In January 2011, Peterson again requested his records. *Id.* at 65. Then, in April 2011, per Plaintiff, Dr. Beliveau speculated that the original "doctor may have used a cadaver." DE #23-6, at 8. At that same time, the doctor referenced particularly the infection history as requiring assessment in advance of a second surgery. DE #23-9, at 72.

Peterson found himself armed with facts requiring diligent inquiry and protective investigation: "A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community." *Kubrick*, 100 S. Ct. at 360. Peterson specifically suspected his arm condition related to something "other than natural causes," *Hertz*, 560 F.3d at 618—saying, in his own words, "it's not natural." As such, Peterson should have done what he planned and pursued outside advice. Accrual does not wait for final medical confirmation. "[F]or accrual purposes, the 'cause' of an injury does not refer to the 'precise medical reason for the injury.'" *Amburgey*, 733 F.3d at 638 (quoting *Kerstetter,* 57 F.3d at 364 (emphasis removed)). Indeed, "[k]nowledge that an injury was a result of medical treatment generally, as opposed to knowledge of the specific injurious action or omission by the physician, is sufficient for a claim to accrue." *Id.* The inquiry notice standard "confers upon the plaintiff 'a duty to inquire into the unknown cause of a known injury.' *In re Swine Flu Immunization Products Liability Litig.,* 880 F.2d 1439, 1443 (D.C. Cir. 1989)." *Webb*, 535 F. Supp. 2d at 58-59. Plaintiff knew the identity of the surgeon, knew he had battled post-surgery infection, knew the arm had never healed, knew the hardware failed, knew a cadaver bone could be involved, and knew the 2011 surgeons were concerned about the infection history. His claim accrued when these facts coalesced.

21

Finally, Peterson argues that the 2014-00048-based claim is not time-barred because he filed it within 6 months of the December 18, 2013, final denial. *See* DE #23-6, at 28-30. This argument, too, is misguided because satisfaction of **both** § 2401(b) time limits is required (a topic explored further below), and Plaintiff missed the initial 2-year deadline. *See, e.g.*, *Ellison v. United States*, 531 F.3d 359, 361 (6th Cir. 2008). Further, and additionally, a plaintiff can only proceed with an FTCA suit "insofar as [he] has exhausted his administrative remedies." *Blakely v. United States*, 276 F.3d 853, 864 (6th Cir. 2002); *see also, e.g.*, *Lundstrum v. Lyng*, 954 F.2d 1142, 1145 (6th Cir. 1991) ("A prerequisite to suit under the FTCA, however, is the exhaustion by the plaintiff of administrative remedies."); *McNeil v. United States*, 113 S. Ct. 1980, 1984 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."); 28 U.S.C. § 2675. Exhaustion, of course, requires "proper exhaustion." *Woodford v. Ngo*, 126 S. Ct. 2378, 2387-89 (2006); *see also, e.g.*, *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029-30 (5th Cir. 2011) (requiring plaintiff to "properly exhaust[] its administrative remedies" under the FTCA); *Smoke Shop, LLC v. United States*, 761 F.3d 779, 789 (7th Cir. 2014) (requiring "submi[ssion of] a proper claim for money damages before filing [a] FTCA suit"); *Usher v. United States*, No. 10-CV-47-JBC, 2010 WL 3721385, at *5 (E.D. Ky. Sept. 15, 2010) (requiring "proper and timely exhaustion of . . . FTCA claims"). Peterson did not properly file the 2014-00048 claim within 2 years of accrual. Accordingly, because his claim "fell outside the two-year limitations period for filing an administrative claim under the FTCA," it "could not serve as a valid administrative claim," *Blakely*, 276 F.3d at 865, and renders this suit time-barred, *Ellison*, 531 F.3d at 361.

Peterson's contrary interpretation of § 2401(b) (which centers on the word "or") perhaps has some facile textual appeal, but the Sixth Circuit has explicitly held: "An FTCA tort claimant must present his claim in writing to the appropriate agency within two years of the date the claim accrued, **and** bring a civil action within six months after the agency mails the notice of final denial of the claim." *Brockett v. Parks*, 48 F. App'x 539, 541 (6th Cir. 2002) (emphasis added); *see also, e.g.*, *Schuler v. United States*, 628 F.2d 199, 201 (D.C. Cir. 1980) (*en banc*) (*per curiam*) (stating that § 2401(b) "is not happily drafted" but that "common sense" requires reading the "or" as not disjunctive); *Willis v. United States*, 719 F.2d 608, 612-13 (2d Cir. 1983) (Friendly, J.) (holding same: "It is settled that 'or' may be read to mean 'and' when the context so indicates."); *Houston v. U.S. Postal Serv.*, 823 F.2d 896, 902 (5th Cir. 1987) ("Though phrased in the disjunctive, this statute requires a claimant to file an administrative claim within two years *and* file suit within six months of its denial." (emphasis in original)); *Galvan v. United States*, 957 F. Supp. 2d 1182, 1184 (E.D. Cal. 2013) ("Though the statute is plainly written as a disjunctive, the Ninth Circuit has construed the language to require satisfaction of both time limits."). As far as the Court can tell, every court that has considered the question has sided against Peterson's preferred interpretation and required satisfaction of *both* § 2401(b) time limits.

More importantly, though, the Sixth Circuit has so concluded, considering the question at length. The Circuit provided a perhaps more satisfying textual interpretation of § 2401(b) regarding the word "or" than other courts: the statute, per the Court of Appeals, "covers claims that fail to satisfy either one of two deadlines—those claims not filed with the agency within two years of their accrual date or those claims not filed within six months of the agency's denial of the claim." *Ellison*, 531 F.3d at 361 (holding

that "because Ellison failed to comply with the last of these conditions, . . . the statute bars her claim"). The Court incorporates herein *Ellison*'s extensive discussion of the § 2675(a) context, the alternative approach's effective elimination of "*any* court deadline," the § 2401(b) text itself, and the relevant case law. *See* 531 F.3d at 361-64 (citing three other Circuits that "have explicitly considered and rejected Ellison's argument that claimants must meet just one of the two deadlines—either the administrative or the court one" and "the fact that all of the other circuits, including our own, have assumed without discussion that both deadlines must be met"). Section 2401(b), the Sixth Circuit summarized, presents "alternative ways of barring a claim," not "alternative ways of preserving a claim." *Id.* at 362.

Peterson's factual situation—where he filed the subject administrative claim outside the 2-year window but filed the FTCA suit within the subsequent 6-month denial window—is hardly unique, and courts regularly dismiss such suits. *See, e.g.*, *Suren-Millan v. United States*, 38 F. Supp. 3d 208, 222 & 220 n.3 (D.P.R. 2013) (dismissing with prejudice an FTCA case where the plaintiff filed an administrative claim "more than two years" after the accrual date but "file[d] the instant lawsuit" "with[in] the six month period established in 28 U.S.C. § 2401(b)"); *Dunlap v. United States*, No. CV 11-01360-PHX-FJM, 2012 WL 3641408, at *1 (D. Ariz. Aug. 24, 2012) (dismissing FTCA suit when plaintiffs "concede[d] that their administrative claims were filed . . . more than five years after the claims accrued, [but] argue[d] that this action [wa]s timely because it was filed less than six months after the . . . deni[al of] their claims"); *cf., e.g.*, *Dyniewicz v. United States*, 742 F.2d 484, 485 (9th Cir. 1984) ("A claim must be filed with the agency within two years of the claim's accrual, and the claimant must file suit within six months of administrative denial of the claim. If either requirement is not met, suit will be time

24

barred."); *Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28, 37 (1st Cir. 2006) (rejecting "Plaintiff's contention that her alleged compliance with section 2401(b)'s statute of limitations relieved her of section 2675(a)'s exhaustion requirement").

In sum, the Court rejects Peterson's legal arguments, and giving Peterson the benefit of every possible factual doubt[13]—using the latest potentially applicable date (which is most beneficial to Peterson)—his 2014-00048 claim accrued no later than April 11, 2011. October 8, 2013 (the date of claim filing), is more than 2 years after April 11, 2011, an independent basis to dismiss this untimely FTCA claim. *Ellison*, 531 F.3d at 361-64; *Blakely*, 276 F.3d at 865. Accordingly, Peterson's FTCA claim is time-barred, and the Court should dismiss it.

> **B.      Equitable tolling does not spare Peterson's claim.**

Although Peterson's claim is time-barred, "[s]ection 2401(b) is not a jurisdictional requirement," and a court may toll the "time limits in the FTCA . . . on equitable grounds." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015); *see also id.* at 1638 ("[W]e hold that the FTCA's time bars are nonjurisdictional and subject to equitable tolling."); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 814 (6th Cir. 2015) (analyzing *Kwai Fun Wong*); *Hawver v. United States*, 808 F.3d 693, 694 (6th Cir. 2015)

---

[13] The factual field, at least vis-à-vis the accrual inquiry, is medical-records-based and uncontested. In this context, the Court assumes Peterson's well-pled facts are true. "What constitutes accrual," though, "is a question of law" for the Court, *Webb*, 535 F. Supp. 2d at 58, and "no reasonable person" could disagree on using April 11, 2011, as the latest possible accrual date for Peterson. Peterson's arguments to the contrary, as the Court has described, are simply *legally* wrong, per the case law.

(overruling prior Sixth Circuit precedent and remanding, post-*Kwai Fun Wong*, for the
district court "to determine whether equitable tolling saves Hawver's [FTCA] claim").[14]

"The factors that [a] court considers in deciding whether to apply the doctrine of
equitable tolling are (1) lack of actual notice of the filing requirement; (2) lack of
constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights;
(4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in
remaining ignorant of the [at-issue legal] requirement." *Glarner*, 30 F.3d at 702; *see also*
*Bazzo*, 494 F. App'x at 547 (same).[15] "Because § 2401(b) provides a limited waiver of
the United States' sovereign immunity," equitable tolling applies only "sparingly." *Id.*
"The party seeking equitable tolling bears the burden of proving entitlement to it." *Id.*
"Equitable tolling allows a federal court to toll a statute of limitations when a litigant's
failure to meet a legally-mandated deadline unavoidably arose from circumstances
beyond that litigant's control." *Jackson*, 751 F.3d at 718. The Sixth Circuit deferentially

---

[14] The Sixth Circuit had previously held that "equitable tolling is available for FTCA
claims in the appropriate circumstances[.]" *Brockett*, 48 F. App'x at 541; *see also*
*Glarner v. United States*, 30 F.3d 697, 701 (6th Cir. 1994) ("§ 2401(b) can be equitably
tolled."); *but see Rogers v. United States*, 675 F.2d 123, 124 (6th Cir. 1982) (*per curiam*)
("There is no equitable exception to the jurisdictional prerequisites of the Federal Tort
Claims Act[.]"), *overruled by Hawver*, 808 F.3d at 694. The Circuit had candidly
recognized its own "inconsistent rulings" on the matter. *Bazzo v. United States*, 494 F.
App'x 545, 546 (6th Cir. 2012).

[15] This 5-part test has been supplanted in other contexts, *see, e.g.*, *Hall v. Warden,
Lebanon Corr. Inst.*, 662 F.3d 745, 749-50 (6th Cir. 2011) (applying a 2-part test to
"determin[e] whether a habeas petitioner is entitled to equitable tolling"), but the Sixth
Circuit has applied the 5-factor test to an FTCA claim as recently as 2014. *See Jackson v.
United States*, 751 F.3d 712, 719 (6th Cir. 2014); *see also, e.g.*, *Krueger v. United States*,
No. 16-13493, 2017 WL 512793, at *3 (E.D. Mich. Feb. 8, 2017) (still, in 2017, applying
the 5-part test); *but cf. Kwai Fun Wong*, 135 S. Ct. at 1631 ("[A] court usually may pause
the running of a limitations statute in private litigation when a party has pursued his
rights diligently but some extraordinary circumstance prevents him from meeting a
deadline." (internal quotation marks removed)).

reviews a district court's decision whether to equitably toll "under an abuse of discretion standard." *Id.*

Here, none of the equitable tolling factors weighs in Peterson's favor. First, Peterson in no way suggest he lacked actual notice of the filing requirement. To the contrary, his case papers and filings reflect acute awareness of it. Indeed, in October 2011, Plaintiff "point[ed] out" to BOP regional counsel that he was "[e]ntitled to purs[u]e [his] claim in the District Court according to [the] Federal Tort Claims Act[.]" DE #23-4, at 8; *see also* DE #23-6, at 22-23 (Peterson specifically referencing the "FTCA statu[t]e of limitation[s] 28 U.S.C. § 2401(b)" and the accrual issue and "contend[ing] on [the] record[] that [he is] timely under Section 2401(b)," citing *Kubrick*, "as to the two year limit"). Second, and similarly, Peterson does not suggest he lacked constructive knowledge of the filing requirement, and the Court sees no such indication.

Third, the case history and record reflect absence of diligent rights pursuit. Despite having "a sufficient opportunity to investigate" the health concerns, *Bazzo*, 494 F. App'x at 548, Peterson timely made no claim, even **more than 2 years** after accrual, which itself was **18 months after** the at-issue surgery. A diligent plaintiff in these circumstances would have acted to protect his rights much sooner—indeed, as early as November and December 2009. Thus, despite an abnormal x-ray showing a suspected hardware fracture in December 2009, Peterson took no investigative steps and bided his time. Even though Peterson felt "stuff moving around in" his arm in January 2010, he chose not to protect his rights. Despite knowing "something [wa]s wrong" with his arm in April 2010, Peterson did not act to protect his rights, instead waiting **over 3 years** from that point to file an administrative claim and **over 4 years** to file this suit. Although he had prior "wound infections" at the surgical site and knew his arm needed to be "fixed"

in June 2010, he did not act. Finally, on April 11, 2011, despite Dr. Beliveau perceiving a "right ulna non-union with broken hardware," with a prior reported "open wound with bloody purulent discharge," and "continual pain and swelling," Peterson made no effort to protect his rights, still waiting **over 2 years** to file an administrative claim and **over 3 years** to file this suit. Peterson's course of conduct conclusively shows no case-related diligence or ardor in attempting to protect his rights. Peterson, in control of the timing, simply chose when to act or not. That is not the subject matter of equitable tolling. *See Jackson*, 751 F.3d at 720 (agreeing that the district court's decision on diligence, in light of "the fact that Jackson did not file her suit despite having had nearly two years to do so[,] was sound and did not amount to an abuse of discretion"); *Hertz*, 560 F.3d at 619 (declining to equitably toll because tolling "would frustrate th[e] purpose" of encouraging "the prompt presentation of claims").

Fourth, the prejudice to the United States is real and palpable on this record; if the Court equitably tolled the FTCA limitation period so as to permit Peterson's claim to proceed to merits resolution, the Government would face months of discovery expenses, the costs of briefing likely dispositive motions, the prospect of dedicating significant time and resources to preparing for trial, and other similar prejudice markers. This prejudice would be all the more tangible given the distinct temporal remoteness of the underlying surgery (which occurred, at this point, nearly 8 years ago). *See Jackson*, 751 F.3d at 720 ("not[ing] the difficulty the government would have in litigating a matter that was filed . . . beyond the limitations period"). Fifth, the Court perceives no reasonableness on behalf of Peterson, who faced the subject extant health problems over the course of many years, yet did not act to formally protect his rights. As the Court recounted, Peterson was not

ignorant of the FTCA's filing requirements, but even if he was, for all the reasons explained, such ignorance would not be reasonable in the circumstances.

Finally, and for completeness, the Court sees no extraordinary circumstance obstructing timely Peterson filing; indeed, he made a separate administrative claim in March 2011, DE #23-4, and was well aware of the subject health issues, and the administrative claim mechanics, since soon after his 2009 surgery.[16] The Court likewise sees "no evidence of improper or fraudulent conduct on the part of [the United States] that either prevented or discouraged Plaintiff from pursuing a claim or concealed from him facts necessary to pursue his claim." *Fletcher v. United States*, 2016 WL 1625822, at *4 (M.D. Tenn. Apr. 25, 2016) (citing *Diminiie v. United States*, 728 F.2d 301, 305 (6th Cir. 1984) for the proposition that, "to defer accrual of cause of action under FTCA, it must be shown that the United States itself played a wrongful role in concealing information from Plaintiff that prevented him from pursuing his claim"). To the contrary, Peterson's *own statements* to medical and prison personnel demonstrate his knowledge of post-surgery medical problems, and it is *his own course of treatment* that put him on inquiry notice of the potential FTCA claim. *See also, e.g.*, DE ##33-6, at 2 (United States providing 35 pages of documents in response to a FOIA request); 1-2, at 60 (BOP staff indicating to Peterson, "I can provide you with a copy of your x-ray."); *id.* at 61 (BOP staff indicating, "Printed all Radiology reports from 7-15-09"); *id.* at 63 (record of medical care indicating that "records were released to the inmate [Peterson] per written request"); *id.* at 90 ("Records were released to you on 5-9-11 at 750 am"); 23-4, at 1

---

[16] To the extent Peterson attempts to reference his medical problems themselves as a circumstance justifying equitable tolling, *see* DE #38, at 4-5, the Court rejects the effort. The medical issues were no obstacle to Peterson raising myriad administrative complaints throughout 2009-11, filing an administrative claim in 2011, and vigorously litigating the current suit. *See also* DE #23-6, at 2-13 (narrating his efforts).

(Peterson acknowledging in March 2011 that he possessed the Oklahoma x-ray). Peterson faced no filing hurdle—much less an extraordinary one—but failed to timely act.[17] Nothing but his own chosen course of conduct caused that result. The tolling burden is Peterson's, and he fails to approach, much less carry, it.

Per this discussion, the Court concludes that there is no basis to equitably toll the FTCA's time limitations so as to permit merits consideration of Peterson's claim. The claim is time-barred, and equitable tolling does not spare it.

## IV.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the District Judge **GRANT** DE #23[18] to the extent it seeks timeliness-based dismissal.[19]

\*    \*    \*    \*    \*

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. As defined by section 636(b)(1) and Rule 72(b), within fourteen days after being served with a copy of this

---

[17] Peterson misunderstanding the law or misapprehending a filing deadline, *see* DE #33, at 14-15, is not a basis for equitable tolling. *Giles v. Beckstrom*, 826 F.3d 321, 325-26 (6th Cir. 2016) (collecting cases). General ignorance of the law, or Peterson's *pro se* status, is likewise insufficient to warrant equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004); *Dunlap v. Scutt*, No. 09-10168-BC, 2009 WL 3059145, at \*3 (E.D. Mich. Sept. 24, 2009) (same).

[18] The Court **DENIES** DE #41, Peterson's motion to strike affidavit portions. The Court did not rely on the contested parts of the subject affidavits or consider them in this ruling; they are thus immaterial to the recommended timeliness-based dismissal. Further, "disagreement with the facts as alleged in an affidavit is not a basis to strike it from the record." *Cottenham v. Saginaw Cnty.*, No. 00-73817, 2001 WL 558235, at \*3 (E.D. Mich. Mar. 9, 2001). That is Peterson's motion basis. *See* DE #41, at 1 (requesting striking "affidavits for being false and not substantiated" and because "they are not the truth"); *id.* at 5 (requesting striking on allegation that affidavit was a "false submission of bad evidence in bad faith").

[19] Based on this recommendation, due to the clarity of the timeliness assessment, and in the interest of judicial economy, the Court declines to engage in a plenary, alternative substantive FTCA analysis. The District Court should dismiss the FTCA claim without reaching the merits.

30

decision, any party may serve and file specific written objections to any or all findings or recommendations for *de novo* consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 72(b) normally waives a party's right to review. *See Thomas v. Arn*, 106 S. Ct. 466 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 22d day of May, 2017.



Signed By:

**Robert E. Wier**

**United States Magistrate Judge**