# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# SOUTHERN DIVISION
# AT LONDON

| STEPHEN DESMUND PETERSON, | CIVIL ACTION NO. 14-CV-134-KKC |
|---|---|
| Plaintiff, | |
| V. | OPINION AND ORDER |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the Recommended Disposition of United States Magistrate Judge Robert E. Wier, (DE 17, at 17) and his earlier Order denying discovery (DE 32). This action was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) for all further disposition, including preparing proposed findings of fact and recommendations on any dispositive motions. (DE 17, at 17). Subsequently, the United States filed a Motion to Dismiss, or in the Alternative for Summary Judgment. (DE 23). The Magistrate Judge issued his Recommended Disposition on that motion on May 22, 2017. (DE 42). Based on his review of the record and the applicable law governing the motion, the Magistrate Judge recommended that the United States' motion be granted on the basis that *pro se* Plaintiff Stephen Desmund Peterson's claim was time-barred. (DE 42 at 30). Pursuant to 28 U.S.C. § 636(b)(1) and Fed R. Civ. P. 72(b)(2), Peterson filed objections to the Magistrate Judge's Recommended Disposition. (DE 44). The United States responded in opposition to those objections, (DE 46), and Peterson replied, (DE 48). As a result, this matter is now ripe for a decision.

# I. BACKGROUND

This action was initiated in June 2014 when Stephen Peterson, a federal inmate confined at United States Penitentiary ("USP") McCreary in Pine Knot, Kentucky, filed a *pro se* civil rights complaint against a number of Defendants. (DE 1). In his complaint, Peterson alleged he was entitled to compensatory damages under the FTCA due to negligence or medical malpractice associated with surgery performed on his right forearm on October 27, 2009, while he was confined at USP-Victorville, in Victorville, California. The procedure was performed by Dr. Louis Redix at Barstow Community Hospital and consisted of a "Repair of malunion of the ulna with bone graft." (DE 1-2, at 2-4). Peterson claimed that Dr. Redix used a contaminated "allograft" cadaver implant without his consent, causing him pain in his forearm and requiring additional surgeries. (DE 1, at 11-12). Following the surgery, Peterson's arm was placed in a cast and he remained hospitalized until October 29, 2009. (DE 1, at 16, DE 1-2, at 4).

Peterson also alleged that Dr. Redix and the prison staff were negligent and deliberately indifferent to his post-surgery medical needs and denied his right to proper medical care. (DE 1, at 16-17). Peterson began complaining to prison medical staff about pain and adverse side effects shortly after the surgery. On November 2, 2009 he complained of "pain and swelling." (DE 1-2, at 19). On December 20, 2009 and again on December 24, 2009 he reported pain in his right forearm at the surgical site one week after doing pushups. (DE 1-2, at 27, 30). On December 28, 2009, an x-ray was performed on Peterson's arm. The radiologist's findings were: "Abnormal. suspected fracture/failure of malleable plate hardware which transfixes mid-ulna fracture at the level of the 3rd-most distal screw. ballistic fragments. non-union of fracture fragments." (DE 1-2, at 31).

On January 25, 2010, Peterson requested another x-ray because "he had surgery on his right forearm approximately three months ago . . . [and] can feel stuff moving in there

sometimes." (DE 1-2, at 41). Peterson again requested a new x-ray on March 26, 2010 and reported that he "still ha[d] a 'cracking/popping' sound with rotation of the right forearm." (DE 1-2, at 47). Peterson was sent for a new x-ray on March 31, 2010. The subsequent radiologist report found: "Abnormal. - fractured fixation plate. - nonunited mid ulnar fracture with distraction and angulation." (DE 1-2, at 56). On April 5, 2010, Peterson was seen by prison medical staff and had his first x-ray reviewed. He complained of "persistent pain and 'feeling stuff move around inside right arm' at surgery site" and denied any new injury. He was told he needed an orthopedic consultation to consider further surgery. (DE 1-2, at 51). Then, on April 18, 2010, Peterson requested copies of his x-rays "to be sent to [his] family doctor to get a second opinion about [his] right finger and forearm." (DE 1-2, at 60). In that request, he stated:

> I am tired of dealing with the pain and discomfort. I know something is wrong in there because of the clicking and popping. My finger is tender and every time I bump it against anything, it hurts. It's not natural for [it] to be like this. I need a second opinion. I would like a copy of my x-rays to be sent out to the streets.

(DE 1-2, at 60).

Peterson received an outside evaluation from Dr. Ronald S. Dubin of the Kentucky Orthopedic Clinic on June 18, 2010. At that appointment, Peterson reported increasing pain over the past several months and a popping sensation in his forearm. Dr. Dubin noted that Peterson had a "non-union proximal ulna with broken plate" and recommended that "the plate should be removed and the proximal ulna should be bone grafted." (DE 1-2, at 69). Dr. Dubin also added in his addendum that "The patient indicates that his initially [sic] injury was in 1993. but he had an operation in California, not USP. He also said there were wound infections and other things." (DE 1-2, at 69). Peterson made another report to prison medical staff on June 23, 2010, who noted that Peterson "State[d] he was told by the orthopedic he would need to not use his right arm until it was fixed." (DE 1-2, at 75). That report also noted

3

that Peterson "state[d] he does not want to wear a splint because that would show a sign of weakness and he does not want anyone to know that he has a disability because of safety concerns inside the prison." (DE 1-2, at 75).

Peterson was referred to Dr. Patrice Beliveau at Premier Orthopedics and Sports Medicine in London, Kentucky. At his examination on April 11, 2011, Dr. Beliveau noted that Peterson reported "that he developed an open wound with bloody purulent discharge, however he was not treated with antibiotics. The wound subsequently closed. He had continual pain and swelling and was eventually diagnosed with a broken hardware and non-union"[1] (DE 1-2, at 88). Dr. Beliveau recorded that he "discussed the findings and treatment options today with the patient. Given his history of questionable infection we have recommended initial blood work . . . This patient was counseled about condition. Patient verbalized understanding of the current plan of care and is agreeable." (DE 1-2, at 89).

Peterson filed his first administrative tort claim related to the surgery (Claim 2011-03006) in March 2011. In that claim he alleged "Damage to the arm abnormal-fractured fixation plate, nonunited mid ulnar fractute [sic] with distraction and angulation." (DE 23-4, at 1).[2] His second administrative claim (Claim 2014-00048), which is the subject of this action, was filed on October 8, 2013.[3]

In his complaint, Peterson asserted (1) an Eighth Amendment claim under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) against various prison officials at five different federal prisons, (2) a tort claim against the United States under the Federal

---

[1] Peterson alleges that this report contains a typographical error and should read "he was treated with antibiotics." (DE 44, at 2). The relevance of this asserted error is discussed in the Court's analysis.

[2] That claim is not at issue in this action. The claim was denied on January 12, 2012 and Peterson failed to file an action by July 12, 2012. Accordingly, the claim is time-barred per 28 U.S.C. § 2401(b). Peterson himself has stated that "Tort Claim TRT-MXR-2011-03006 is not at issue here . . . ." (DE 33, at 5).

[3] All parties now agree that the claim's date of "10-08-2012" was a typo and that the claim was not filed until October 8, 2013. (DE 33, at 17) ("The Plaintiff did not submit the second administrative tort claim to the BOP until October 9, 2013.").

4

Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, and (3) state law tort claims for negligence and medical malpractice. The Court dismissed all of Peterson's claims in two screening orders.[4] Peterson's FTCA claim was initially dismissed as time-barred in the Court's second screening Order issued on April 13, 2016. (DE 12, at 37). In that Order, the Court found that Peterson did not submit his FTCA claim to the Board of Prisons ("BOP") until October 8, 2013, nearly four years after his initial surgery on October 27, 2009. (DE 12, at 9). Accordingly, the Court found the claim was time-barred by the two-year statute of limitations and that it therefore lacked jurisdiction to consider the claim. (DE 12, at 8); *see* 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ."). Peterson, however, submitted a Motion for Reconsideration on April 26, 2016. (DE 14). Pursuant to that motion, and to err on the side of caution, the Court reopened Peterson's FTCA claim to consider whether dismissal of an FTCA claim for lack of subject matter jurisdiction on statute of limitation grounds was inappropriate. (DE 17, at 8); *see United States v. Kwai Fun Wong*, ___ U.S. ___, 135 S.Ct. 1625, 1629, 191 L.Ed.2d 533 (2015) (holding that the FTCA time limits were non-jurisdictional and subject to equitable tolling).

The Magistrate Judge filed a Recommended Disposition in this matter on May 22, 2017. (DE 42). Based on his review of the record and applicable case law, the Magistrate Judge recommended that the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment (DE 23) be granted on the grounds that the FTCA claim was time-barred. (DE 42, at 1). The Magistrate Judge concluded that Peterson's claim accrued "likely

---

[4] In the first screening Order entered by this Court on January 22, 2015, Peterson's *Bivens* claims against prison officials outside Kentucky were severed and transferred to other judicial districts. (DE 8, at 14). In that order, the Court also declined to exercise supplemental jurisdiction over his state law tort claims and dismissed those claims without prejudice to his right to refile those claims in state court. (DE 8, at 14-15). His remaining *Bivens* claims were dismissed in the Court's second screening Order on April 13, 2016 for failure to state a claim and failure to establish deliberate indifference to his medical needs. (DE 12, at 37-38).

5

in late 2009, potentially at various points in 2010, and **certainly no later than April 11, 2011**." (De 42, at 14-15). Because Peterson did not file his claim until October 8, 2013, at least two years after accrual, the claim was time-barred by 28 U.S.C. § 2401(b). (DE 42, at 14-15).

The Magistrate Judge rejected Peterson's argument that he did not know the precise cause of his problem or that the claim did not accrue until his actual awareness of the exact medical injury. This theory, the Magistrate Judge found, was inconsistent with the Sixth Circuit's inquiry-notice accrual rule, which holds that a claim accrues when a plaintiff possesses enough information related to the injury to seek out legal and expert advice about whether to file a claim. *See Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009) (alteration in original) (quoting *McIntyre v. United States*, 367 F.3d 38, 53 (1st Cir. 2004) (citing *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)). Instead, as the Magistrate Judge succinctly summarized, Peterson "knew the identity of the surgeon, knew he had battled post-surgery infection, knew the arm had never healed, knew the hardware failed, knew a cadaver bone could be involved, and knew the 2011 surgeons were concerned about the infection history. His claim accrued when those facts coalesced." (DE 42, at 21).

The Magistrate Judge also considered Peterson's argument that his claim was not time-barred because it was filed within six months of December 18, 2013, when his previous claim was denied. (DE 42, at 22). This argument was found to be inconsistent with the Sixth Circuit's interpretation of the statute: "An FTCA tort claimant must present his claim in writing to the appropriate agency within two years of the date the claim accrued, *and* bring a civil action within six months after the agency mails the notice of final denial of the claim." *Brockett v. Parks*, 48 F. App'x 539, 541 (6th Cir. 2002) (emphasis added). The two year or six month deadlines in § 2401(b) presents "alternative ways of barring a claim," not "alternative ways of preserving a claim." *Ellison v. United States*, 531 F.3d 359, 362 (6th Cir. 2008).

6

Accordingly, the Magistrate Judge rejected Peterson's legal argument regarding the construction of § 2401(b).

Finally, the Magistrate Judge found that Peterson's claim was not saved by equitable tolling. Weighing the five equitable tolling factors, the Magistrate Judge found that none weighed in Peterson's favor. (DE 42, at 26-27). Peterson did not lack actual notice of the filing requirement, but was instead acutely aware of it. Similarly, nothing on the record suggested that Peterson lacked constructive knowledge of the filing requirement. Third, Peterson failed to diligently pursue his rights by bringing his claim more than two years after accrual, which itself was eighteen months after the at-issue surgery. Fourth, the United States would suffer real and palpable prejudice in the form of months of discovery and litigation expenses. And finally, the Magistrate Judge found "no reasonableness on behalf of Peterson, who faced the subject extant health problems over the course of many years, yet did not act to formally protect his rights. (DE 42, at 27-28).

## II. STANDARD OF REVIEW

The United States moved to dismiss or, in the alternative, for summary judgment. (DE 23). In his Recommended Disposition, the Magistrate Judge addressed the argument that Peterson's claim is time-barred under the standard for both a motion to dismiss and a motion for summary judgement. (DE 42, at 8-12).

When evidence outside the pleadings are presented to and accepted by the Court, the Federal Rules provide that a Rule 12(b)(6) motion to dismiss must be treated as a Rule 56 motion for summary judgement. Fed. R. Civ. P. 12(d); *see Wysocki v. Int'l Bus. Machine Corp.*, 607 F.3d 1102 (6th Cir. 2010). The United States did not style its motion as a 12(b)(6), but its motion cannot proceed under Rule 12(b)(1) because the time-bar in § 2401(b) is not jurisdictional. *Kwai Fun Wong*, ___ U.S. ___, 135 S. Ct. at 1632; *see Herr v. United States*, 803 F.3d 809, 814 (6th Cir. 2015) (discussing *Kwai Fun Wong*). Accordingly, the United

7

States' motion is best characterized as a 12(b)(6) failure to state a claim upon which relief can be granted. Because the parties presented evidence outside the pleadings that was accepted and considered by the Magistrate Judge, Rule 56 applies.

Pursuant to Rule 56, a court shall grant summary judgement "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed R. Civ. P. 56(a). When assessing a motion for summary judgement, the court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elc. Co., Ltd. V .Zenith Radio Corp.*, 106 S. Ct .1348, 1356 (1986). When a defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. ANALYSIS

Peterson timely filed objections to the Magistrate Judge's recommendations (DE 44). The United States filed a response (46) and Peterson filed a reply (DE 48). This Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendation to which an objection was made. 28 U.S.C. § 636(b)(1)(C). The basis of Peterson's argument is that his claim did not accrue until Dr. Beliveau told him about the infection on November 1, 2011. (DE 44, at 1). Peterson's specific objections are discussed in turn.

A. <u>The Magistrate Judge correctly determined the date of accrual</u>

A tort claim brought under the FTCA is "forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). Generally, the date of accrual is the time of the injury. *See United States v. Kubrick*, 444 U.S. 111, 120 (1979) ("[T]he general rule under the [FTCA] has been that a tort claim accrues at the time of the plaintiff's injury . . . ."). *Kubrick*, however, established a different

rule for medical malpractice cases, holding that a "plaintiff's medical malpractice claim accrues when he 'knows both the existence and the cause of his injury.'" *Amburgery v. United States*, 733 F.3d 633, 636 (6th Cir. 2013) (citing *Kubrick*, 444 U.S. 111). Accordingly, in medical malpractice cases, the test for accrual under the FTCA is an inquiry-notice rule, not a discovery rule.[5] *Hertz*, 560 F.3d at 618 (6th Cir. 2009). Under the inquiry-notice regime, a medical malpractice plaintiff who is "armed with the facts about the harm done to him" cannot "await awareness . . . that his injury was negligently inflicted" but must instead "protect himself by seeking advice in the medical and legal community." *Kubrick*, 444 U.S. at 123. The rule emerging from *Kubrick* can best be summarized as: "[A] claim accrues when a plaintiff possesses enough information with respect to h[is] injury that, 'had []he sought out independent legal and expert advice at that point, []he should have been able to determine in the two-year period whether to file an administrative claim." *Hertz*, 560 F.3d at 618 (internal alteration omitted) (quoting *McIntyre v. United States*, 367 F.3d 38, 53 (1st Cir. 2004) (citing *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)).

Peterson objects to the Magistrate Judge's determination of the date of accrual, arguing that the United States did meet its burden of proof to show that his claim accrued prior to November 1, 2011. (DE 44, at 1, 10). Peterson was admitted to St. Joseph Hospital on November 1, 2011 and, soon after his admittance, Dr. Beliveau took a culture from his right forearm that tested positive for MRSA and Enteroccus faecalis. (DE 44-7, at 2). Peterson claims that this diagnosis represents his true accrual date.

The burden is on the government to show that the statute of limitations has run in an FTCA action. *Hogan v. United States*, 42 F. App'x 717, 722 (6th Cir. 2002). As the Magistrate

---

[5] Other circuits classify the rule in *Kubrick* as a "discovery rule," but those circuits define a discovery rule as the Sixth Circuit defines an inquiry notice rule: "discovering the injury and its cause." *Amburgey*, 733 F.3d at 636-37. Peterson argues in his motion that *Kubrick* did establish a discovery rule, but merely provides a block quote to *Hertz* and reiterates his claim that the government did not meet their burden of proof. (DE 44, at 12-13).

9

Judge explained in his Recommended Disposition, there is ample evidence that Peterson was placed on inquiry notice prior to October 2011. The Magistrate Judge noted nine critical dates prior to October 2011 that indicated Peterson possessed the requisite knowledge with respect to his injury to seek out independent legal and expert advice about filing a tort claim. This evidence is summarized below.

On December 30, 2009, Peterson underwent an x-ray that found his forearm was "Abnormal. Suspected fractural/failure of malleable plate hardware . . . non-union of fracture fragments." (DE 1-2, at 31). On January 25, 2010, Peterson complained to Bureau of Prison medical staff that "he had surgery on his right forearm approximately three months ago and wants an xray . . . 'because I can feel stuff moving around in there sometimes." (DE 1-2, at 41). On April 5, 2010, Peterson again complained of "persistent pain and 'feeling stuff move around inside [his] right arm' at [the] surgery site" and denied any new injury. (DE 1-2, at 51). He was advised that he may need further surgery, and another x-ray revealed "abnormal," "fractured fixation plate," and "nonunited mid unlfar fracture with distraction and angulation." (DE 1-2, at 56). On April 18, 2010, Peterson sought a second opinion, complaining: "I am tired of dealing with the pain and discomfort. I know something is wrong in there because of the clicking and popping." (DE 1-2, at 60). On June 18, 2010, Peterson saw an outside orthopedic. His medical notes showed Peterson reported "increasing . . . pain" at the surgical site and prior "wound infections" and "other things" wrong from the forearm surgery. (DE 1-2, at 69). On June 23, 2010, Peterson told prison medical staff that the orthopedic told him "he would need to not use his right arm until it was fixed." (DE 1-2, at 75). In March 2011, Peterson filed Claim 2011-03006, seeking personal injury damages for pain in his arm resulting from the forearm surgery. (DE 23-4, at 1). And finally, on April 11, 2011, Peterson saw Dr. Beliveau, whose medical notes contained Peterson's report that "he had continued pain and subsequently had a malunion correction in 2009," and subsequently

developed "an open wound with bloody purulent discharge and "continual pain and swelling." (DE 1-2, at 88). In his plan of care, Dr. Beliveau recommended blood work because of his "history of questionable infection." (DE 1-2, at 89).

This Court agrees with the Magistrate Judge's determination that these facts constitute evidence that Peterson was on inquiry notice of his claim by April 11, 2011 and as early as December 30, 2009. Peterson's repeated complaints to prison medical staff and outside doctors and the fact that he filed a claim related to the surgery show that he possessed "enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Amburgey*, 733 F.3d at 637 (quoting *Hertz*, 560 F.3d at 619) (internal alteration omitted).

Peterson argues that the proper accrual date is November 1, 2011, the date on which he had actual knowledge of the infection because of Dr. Beliveau's diagnosis. This argument ignores the Sixth Circuit's clear precedent establishing an inquiry-notice rule for FTCA claim accrual. For his claim to accrue, Peterson did not have to know the "precise medical reason for the injury." *Amburgey*, 733 F.3d at 638 (quoting *Kerstetter v. United States*, 57 F.3d 362, 364 (4th Cir. 1995). Instead, mere "knowledge that an injury was a result of medical treatment generally, as opposed to knowledge of the specific injurious action or omission by the physician, is sufficient for a claim to accrue." *Id.* Even if Peterson did not know the exact nature or cause of the infection, he did know that the pain, discomfort, and infections he had suffered were the result of his forearm surgery. Accordingly, Peterson's argument that the accrual date must be tied to Dr. Beliveau's November 2011 diagnosis fails. At the very latest, Peterson's claim accrued in April 2011.

B. Dr. Beliveau's typographical error is irrelevant to the accrual date

Peterson next alleges that the Magistrate Judge relied on a typographical error in his Recommended Disposition. In providing the factual background, the Magistrate Judge,

quoting from this Court's earlier opinion (DE 12), included the following statement from Dr. Beliveau's April 11, 2011 exam notes:

> The patient states that in 1993 he sustained a gunshot wound to his right forearm. At that time he was treated conservatively with casting after the bullet was removed. This did result in a [sic] isolated ulna fracture. The patient states that he had continued pain and subsequently had a malunion correction in 2009. **Following this surgery the patient reports that he developed an open wound with bloody purulent discharge, however he was not treated with antibiotics. The wound subsequently closed. He bad continual pain and swelling and was eventually diagnosed with a broken hardware and non-union.** The patient was subsequently referred to our services for further investigation.

(DE 42, at 6-7, DE 1-2, at 88). Peterson claims that the record should omit the word "not" and read "he was treated with antibiotics." (DE 44, at 2). He contends that medical staff at USP Victorville did prescribe him antibiotics, which made the arm appear to be healed. (DE 44 ,at 2). Peterson is correct that the record shows that he was prescribed antibiotics following the surgery on November 19, 2009. (DE 44-1, at 3). This error, however, had no effect on the Magistrate Judge's recommendation and does not indicate that his claim accrued later than April 2011. As discussed above, Peterson's medical records from November 2009 until April 2011 contain numerous subjective complaints that indicate he was aware that his arm was not healing properly. He stated repeatedly that he experienced pain and discomfort, an open wound, and bloody discharge and his x-rays consistently revealed abnormal findings. Peterson claims that the antibiotics he was prescribed in November 2009 made the arm appear to be healed, but on December 30, 2009 Peterson received the results of an x-ray that indicated his forearm was "Abnormal. Suspected fracture/failure of malleable plate hardware . . . non-union of fracture fragments.) (DE 1-2, at 31). Therefore, even if Peterson mistakenly believed that he was healed due to the antibiotics, he was placed on inquiry notice when he received the x-ray alerting him that the surgery was not properly healing.

The additional medical records cited by Peterson do not show that his accrual date was incorrectly determined. While Nurse Practitioner Bennet-Baker noted that Peterson had a

"well-healed scar to right lateral forearm," Peterson also stated during that appointment that he wanted an x-ray "because I can feel stuff moving in there" and the Nurse Practitioner noted that he had an "abnormal recent xray." (DE 44-4, at 2). Similarly, the record of Peterson's June 18, 2010 appointment with Dr. Ronald Dubin support the conclusion that Peterson was on inquiry notice as of that date. While Dr. Dubin did state that Peterson had a "[w]ell healed scar," that report also noted Peterson complained of increasing pain, a "popping sensation in his forearm", and "wound infections and other things" (DE 44-2, at 2).[6]

C. Peterson was not unaware of his claim due to failure to diagnose or treat

In his objections, Peterson recounts his second surgery on November 1, 2011 during which Dr. Beliveau informed him he had a serious infection. After the surgery, Peterson claims he requested copies of his medical records but that they omitted Dr. Beliveau's diagnosis of a serious infection. Concerned that prison officials were "playing dirty," Peterson states he filed a Freedom of Information Act Request which produced the records that he claims revealed to him in September 2012, for the first time, that Dr. Beliveau had diagnosed him with an infection from his first surgery. In making this argument, Peterson cites to three failure to diagnose or treat cases which he claims supports his November 1, 2011 accrual date. (DE 44, at 4-7). Those cases, however, do not support Peterson's argument that doctors failed to diagnose or treat him until April 11, 2011.

Peterson first cites to an unpublished opinion from the Ninth Circuit. *See Desart v. United States*, Nos. 88-2877, 88-2996, 1989 WL 99253 (Table) (9th Cir. Aug. 22, 1989). In that case, the plaintiff was incorrectly assured that their daughter's meningitis was treated early and the doctors specifically told her that the cause was unknown. *Id.* at *2. Peterson, in contrast,

---

[6] As discussed above, Dr. Beliveau's April 11, 2011 report also indicated that Peterson was on inquiry notice as of that date. The other records cited by Peterson both date to after November 1, 2011 and are therefore not relevant to determining whether he was on inquiry notice before October 2011. (DE 44-7, DE 44-8).

was repeatedly told that his x-rays were abnormal and suggested that the hardware was not healing correctly. (DE 1-2, at 31 ("Abnormal. Suspected fracture/failure of malleable plate hardware . . . ."); DE 1-2, at 56 ("Abnormal. – fractured and fixation plate.")). Peterson next cites to a case from the District of Hawaii, in which a plaintiff discovered lumps which he suspected were cancerous, but had his requests for a biopsy ignored leading his cancer to go undiagnosed. *Lichtenberg v. United States*, No. 10-00353, 2010 WL 5174382, at *6 (D. Haw. Dec. 15, 2010). Unlike the plaintiff in *Lichtenberg*, Peterson's requests for treatment were not ignored. He received multiple x-rays that suggested his arm was not healing correctly.

Finally, Peterson cites one case from this district. *See Davis v. United States*, No. 08-184-ART, 2012 WL 424887 (Feb. 9, 2012). In that case, however, the evidence suggested that the plaintiff may have been unaware that malpractice caused his injury. *Id.* ("Without better evidence, the Court cannot guess whether Davis believed the government caused his injuries . . . ."). Peterson has admitted that he "was clearly aware, via medical data, that his October 27, 2009, surgery had not healed properly" by April 26, 2010. (DE 33, at 14). While the plaintiff in *Davis* "could have only speculated that his injuries were caused by" malpractice, prior to his eventual diagnosis, Peterson possessed enough information to "be aware of probable government causation." *Davis*, at *4-5 (first citing *Arroyo v. United States*, 656 F.3d 663, 672 (7th Cir. 2011); then citing *Kubrick*, 444 U.S. at 118).

D. <u>Peterson's claim is not subject to equitable tolling</u>

Peterson's final argument, that the government should be estopped from arguing the claim is time-barred, is best understood as objecting to the Magistrate Judge's finding that equitable tolling does not apply. (DE 44, at 13; DE 42, at 25).

The Supreme Court has recognized that the FTCA's two-year statute of limitations "is not a jurisdictional requirement" and therefore "a court can toll them on equitable grounds."

14

*Kwai Fun Wong*, ___ U.S. at ___, 135 S. Ct. at 1633; *see also Herr*, 803 F.3d at 814. In assessing equitable tolling, the Court must consider five factors:

> (1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement.

*Glarner v. United States*, 30 F.3d 697, 702 (6th Cir. 1994) (citing *Andrews v. Orr,* 851 F.2d 146, 151 (6th Cir.1988)). The burden to prove equitable tolling falls on the party seeking to invoke it. *Bazzo v. United States*, 494 Fed. App'x 545, 547 (6th Cir. 2012).

As the Magistrate Judge explained, none of the five factors weigh in Peterson's favor. Peterson at no point has argued that he lacked actual notice or constructive knowledge of the filing requirement and as early as October 2011 has shown his actual knowledge of it. (DE 23-4, at 8 (stating in October 18 2011 that he was "intitled [sic] to purse [sic] my claim in the District Court according to Subchapter C of the Federal Tort Claims Act . . . .")).

Peterson also failed to diligently pursue his rights. Peterson began complaining of pain in his forearm and received abnormal x-ray results as early as December 2009, but Peterson failed to file the administrative claim in this action until October 13, 2013 and did not initiate this lawsuit until June 9, 2014. Peterson was, at the very latest, on inquiry notice by April 2011 and, by his own admission, on actual notice by November 2011. Yet he still waited nearly two years from those dates to bring a claim. Peterson's failure to promptly present his claim—waiting twenty-three months from the date of actual notice—weighs heavily against applying equitable tolling. *See Chomic v. United States*, 377 F.3d 607 (6th Cir. 2004) (refusing to apply equitable tolling when the plaintiff had seventeen months to investigate and file a timely claim).

Tolling the FTCA limitation period would also cause substantial prejudice to the United States, forcing it to litigate, at great expense, a claim that has become temporally remote, as

nearly eight years have passed since Peterson's surgery. *See Jackson v. United States*, 751 F.3d 712, 720 (6th Cir. 2014) (noting "the difficulty the government would have in litigating a matter that was filed four months beyond the limitations period" in weighing prejudice).

Peterson asserts that the government "impeded and tried to prevent Plaintiff from getting the cause of his arm not healing." (DE 44, at 14). This argument, however, does not establish that Peterson was reasonable in not filing his claim nor that extraordinary circumstance obstructed timely filing. *See Kwai Fun Wong*, 135 S. Ct. at 1631 ("[A] court usually may pause the running of a limitations statute in private litigation when a party has pursued his rights diligently but some extraordinary circumstance prevents him from meeting a deadline.") (internal quotation marks omitted). Peterson states that he was impeded from receiving medical records that showed he was Dr. Beliveau had diagnosed him with an infection in November 2011. (DE 44, at 14). But, as discussed above, Peterson was on inquiry notice of his claim by April 2011. Peterson himself claims to have been on actual notice of this infection on November 1, 2011 and yet did not file a claim. And, moreover, Peterson waited sixteen months after receiving his medical records to file any administrative claim. Such a lengthy delay in bringing his claim after being placed on actual notice cannot be described as reasonable or considered the result of government impediment. Accordingly, Peterson has not met his burden for showing that equitable tolling should apply to his FTCA claim.

E. The Magistrate Judge correctly denied Peterson's Motion for Discovery

Lastly, the Court finds that the Magistrate Judge correctly denied Peterson's Motion for Discovery (DE 32). Peterson filed a motion requesting discovery on February 13, 2017 (DE 26) which was denied by the Magistrate Judge on March 17, 2017 (DE 29). Peterson filed a second motion for discovery on April 10, 2017 (DE 32) which was again denied by the

Magistrate Judge on May 15, 2017 (DE 39). Peterson filed an objection to the denial of discovery (DE 43) and the United States filed a response (DE 45).

The Magistrate Judge properly denied Peterson's discovery request. In his reply brief (DE 37), Peterson provided the clearest summary of the matters on which he desired to conduct discovery. Peterson seeks handwriting samples from staff at USP McCreary and the regional counselor who processed his tort claim, but provides no reason as to why handwriting samples would be relevant to his claim accrual date. (DE 37, ¶¶ 1, 4, 10). He also seeks original copies of the x-rays and lab tests for his expert witnesses to evaluate (DE 37 ¶ 3, 5, 6). But Peterson has previously had his x-rays issued to him by prison staff and expert witnesses to assess his medical records are not necessary to determine when Peterson was on inquiry-notice of his claim. (DE 1-2, at 63) (administrative note indicating x-rays released to Peterson). Three of his requests pertain to medical records and therefore are more relevant to the date of accrual (DE 37, at ¶ 2, 8, 9).[7] But Peterson has already been able to obtain his medical records through requests to prison medical staff and Freedom of Information Act requests (DE 44, at 5; DE 33-6)) and has filed numerous medical records in support of his claim. In his objection, Peterson states that denial of discovery prevents him from overcoming the Magistrate Judge's Recommended Disposition. (DE 43, at 1). In that objection, Peterson requests records from Dr. Beliveau's April 11, 2011 examination. Yet the record of this appointment has already been placed on the record. (DE 1-2, at 88). Moreover, the purpose for which Peterson seeks discovery of these records would have no effect on the accrual date. As discussed above, whether Dr. Beliveau's report contained a typo was irrelevant to the accrual date.

---

[7] Request seven is for records of food strikes and suicide watch, which the Court finds to have no relevance to Peterson's date of accrual, and notes that Peterson has not suggested in his briefing that food strikes or suicide watch would in some way effect his accrual date.

## IV. CONCLUSION

For the foregoing reasons, the Court, being otherwise sufficiently advised, **HEREBY ORDERS** that:

1. the Magistrate Judge's Order denying any discovery-related relief (DE 39) is **ADOPTED** as and for the opinion of the Court;

2. the Plaintiff's objections to the Magistrate Judge's Order (DE 43) are **OVERRULED**;

3. the Magistrate Judge's Recommended Disposition (DE 42) is **ADOPTED** as and for the opinion of the Court;

4. the Plaintiff's objections to the Magistrate Judge's Recommended Disposition are **OVERRULED**

5. the Defendant's Motion to Dismiss, or in the Alternative For Summary Judgment (DE 23) is **GRANTED** on the basis that Plaintiff's FTCA claim is time-barred.

6. a judgement consistent with this Opinion will be entered contemporaneously.

Dated October 31, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY